FRANK DeLAURENTIS *v.* CITY OF NEW HAVEN ET AL. (14267)

PETERS, C. J., SHEA, CALLAHAN, GLASS and BORDEN, Js.

Argued June 6—decision released August 20, 1991

*Steven J. Errante,* for the appellants (defendants).

*John R. Williams,* with whom, on the brief, was *Sue L. Wise,* for the appellee (plaintiff).

SHEA, J. We consider today what redress, if any, should be afforded a public official called to defend himself publicly against charges of wrongdoing and incompetence subsequently found by a jury to have been baseless, but some of which we conclude were grounded in probable cause as a matter of law. As a result of this determination, we set aside in part the verdicts of the jury awarding damages to the plaintiff for vexatious suit and for the intentional infliction of emotional distress and we remand the case to the trial court for further proceedings.

The plaintiff, Frank DeLaurentis, former chairman of the New Haven parking authority commission, sued the defendants, the city of New Haven and its then mayor, Biagio DiLieto, after the mayor first instituted and then abandoned removal proceedings against him. His six count complaint raised three claims: an unspecified claim that the trial court interpreted to be a claim under article first, § 10, of the Connecticut constitution, for the "imposition of a stigma by official action" in violation of due process; malicious prosecution; and intentional infliction of emotional distress. Each claim was framed in two counts, one against the mayor, and the other against the city.[1] The trial court struck the

---

[1] The counts against the city alleged that "[a]t all times relevant to this action, defendant DiLieto acted by and on behalf of the defendant City of New Haven" and that DeLaurentis had given the city clerk timely notice

two counts containing the constitutional claim, but the other counts were tried to a jury, which rendered verdicts in favor of DeLaurentis.

In support of the verdicts, the jury could reasonably have found the following facts. DeLaurentis had served on the New Haven parking authority commission since he was first appointed in 1974. He was elected as its chairman in 1975. As did all other members of the commission, DeLaurentis served without pay.

The New Haven parking authority (the authority) is a municipal entity established by statute. 26 Spec. Acts 339, No. 473 (1951). It is not subject to supervision by the mayor, whose sole power over the authority is his general power to appoint and discharge the commissioners, subject to specific charter provisions. Appointments are at the mayor's discretion, but are made for staggered five year terms. During that five year term, commissioners may be removed only for cause and after a public hearing. New Haven City Charter, art. XXXIV, §§ 220, 221.[2] DeLaurentis had been reappointed to

_____

of his claim against the city. The city's liability for the mayor's acts has not been challenged by the city, either before the trial court or before this court.

[2] "[New Haven City Charter, art. XXXIV,] Sec. 220. GROUNDS, PROCEDURE FOR REMOVAL BY MAYOR.

"Whenever the mayor has reasonable grounds for believing that any officer of the city not in the classified service is corrupt, incompetent or unfaithful to the duties of his office, or that the requirements of the public service demand his removal, he may summon said officer to appear before him at a time and place specified in said summons then and there in a public hearing to show cause why he should not be removed from office. Said summons shall contain a detailed written statement of the charges against the officer, shall be addressed to any sheriff, deputy sheriff, or constable authorized to serve legal process in the City of New Haven, with a direction to make personal service of the same upon the summoned officer at least ten days before the time affixed for said hearing. If, after a full hearing, the mayor shall find that the officer in question is corrupt, or incompetent, or unfaithful to the duties of his office, or that the requirements of the public

the authority in 1982 by the defendant, then mayor, Biagio DiLieto (the mayor).

The authority was responsible for the maintenance and operation of the city parking garages and public parking lots. 26 Spec. Acts 339, No. 473, §§ 3, 10 (1951). An entirely separate agency, within the city government, the department of traffic and parking, was in charge of traffic control, enforcement of parking ordinances, and other similar matters. New Haven City Charter, art. XLI, §§ 288, 289. The department of traffic and parking, and the parking authority, have entirely different budgets and sources of income. 26 Spec. Acts 339, No. 473, §§ 4, 9 (1951).

The New Haven city charter and the authority bylaws prescribed that one traffic engineer was to be included on the parking authority commission in addition to the five commissioners. That position was occupied by John Cavallero, who had also served as the authority's executive director for many years, even before DeLaurentis' appointment. At the same time Cavallero also held the position of director of the department of traffic and engineering, a salaried position paid from city funds. In addition to Cavallero and DeLaurentis, the parking authority members were Joseph Vegliante, Irvin Zeidenberg, Walter Piurek and Robert Schwartz.

---

service demand his removal he may remove such person from office, and thereupon shall forthwith file a written order of such removal with the city clerk.

"Sec. 221. APPEAL FROM REMOVAL BY MAYOR.

"Any officer removed from his office by the mayor as herein provided may appeal from the order removing him to the court of common pleas for New Haven County, which appeal shall be made returnable to said court not less that fifteen and not more than thirty days from the date of the order of removal and shall be served upon the mayor at least five days before the return day thereof. Said court upon return of said appeal shall forthwith fix a time for a hearing thereon at which it shall determine whether the mayor has acted arbitrarily, illegally, or so unreasonably as to have abused his discretion, and award costs. No officer removed by the mayor shall exercise any of the duties or powers of his office during the pendency of an appeal from the order removing him."

In early 1983, the mayor received reports that 430 parking tickets had been found in an elevator shaft. In response, he called police chief William Farrell, who assigned detective John Prokop to investigate possible improprieties at the parking authority. The mayor knew Prokop and subsequently appointed him to the zoning board of appeals. In March, 1983, Prokop filed his report with the chief of police. Farrell forwarded the report to the mayor, who reviewed it carefully.

The report, in the words of the mayor, "reads more like the report of [a] management consultant than a detective." While much of the report contains criticism of the authority's record keeping and accountability procedures, it also explicitly states that individual authority employees who had previously been "caught stealing" were suspended only briefly but never fired; that some of these employees were related to other public officials, such as the head of security; that certain individual employees had overcharged for tickets and pocketed the difference; that a "sting" operation conducted between November, 1981, and February, 1983, indicated that more than 1000 tickets were missing from almost every month's receipts; that in December, 1981, 2189 tickets, or 2.34 percent of the total issued, were missing; and that in some cases employees were recorded as having received workers' compensation on the same days that they were actually on the job and being paid for working. The report alluded to written memoranda and other evidence that formed the basis for these factual conclusions. The mayor was shocked by what the investigation had found and asked chief Farrell to send the report to the state's attorney for New Haven county in June, 1983. The mayor neither demanded that Prokop produce his evidence nor took any action to remove any of the officials criticized in the report.

The mayor gave a copy of the report to Cavallero, who told the other commissioners that he would conduct his own investigation before the report would be released to the public. When DeLaurentis, under pressure from detective Prokop, asked the mayor what was happening about the report, the mayor told him he was waiting to hear from the state's attorney. In fact, neither Cavallero, nor the state's attorney, nor the mayor, ever took any action based upon the Prokop report.

In August, 1983, Cavallero presented a reimbursement request for $1196, the cost of his trip to the Institute of Transportation Engineers association meeting in London. DeLaurentis refused the request, on the ground that the expense was unauthorized and should, if anything, be charged against the city's, rather than the parking authority's, budget. When Cavallero presented his request to the other commissioners, DeLaurentis went to the mayor. The mayor told DeLaurentis to send Cavallero to the city's controller, who would probably refuse to honor the reimbursement request. As a result of DeLaurentis' opposition to this reimbursement, the "war" between Cavallero and DeLaurentis began in earnest.

The dispute between Cavallero and DeLaurentis ripened into a battle for control of the parking authority. In December, 1983, DeLaurentis proposed a resolution adopted by the authority, that there would be no charges to parking authority funds except for parking authority business. Prior to that date, the authority had no explicit rules and regulations on the subject. Cavallero maintained that as executive director, he had the discretion to determine what constituted parking authority business. DeLaurentis insisted that the commission or the chairman make that determination. According to the bylaws, however, Cavallero was a nonvoting member of the commission. Cavallero asked

the assistant corporation counsel assigned to the parking authority, Susan Goodshall, to research the validity of the bylaw making him a nonvoting member. She reported that state statutes forbade such a restriction. Cavallero, accordingly, decided that the bylaws should be changed so that he would have a vote on the commission. He was supported by commissioners Schwartz and Zeidenberg, but opposed by commissioners DeLaurentis, Piurek and Vegliante.

About the same time, DeLaurentis, acting on a tip from the authority's controller, discovered that unauthorized or improper travel and entertainment expenditures were being paid from authority funds. He obtained thirty to forty vouchers for reimbursement from the administrative fund that either lacked the requisite number of signatures, were signed by the same official requesting reimbursement, or were unrelated to parking authority business. Some were vouchers for substantial sums: $1300 for a trip to California and $1500 for a trip to Europe. Almost all were reimbursement requests made by Frank Erff, the general manager who worked under Cavallero, or by Cavallero. All were signed by Cavallero.

In January, 1984, DeLaurentis called the mayor and asked to meet with him to discuss the vouchers. When he arrived, he was referred to Joseph Carbone, the mayor's administrative aide. Carbone reviewed the vouchers and declared that because they were just for "junkets," the reimbursements would be appropriate. In February, DeLaurentis returned with more vouchers, and met with the mayor, Carbone, and Vincent Mauro, the town Democratic party chairman and a long-time advisor of the mayor. The mayor brushed DeLaurentis' concerns aside, saying that because Carbone had already looked at the vouchers, he had no reason to do so. All three demanded that DeLaurentis write a

letter to the effect that the matter had been resolved, but DeLaurentis refused.

At about the same time, a political associate of the mayor asked DeLaurentis to find a job for the mayor's brother, Tom DiLieto, who was unemployed. Tom DiLieto was put to work in the parking authority over the objections of Cavallero, who described him as a "troublemaker." Almost immediately, Tom DiLieto reported to DeLaurentis that friends of Cavallero were parking in the garages where Tom was working, without paying for parking stickers. DeLaurentis reported these charges to the mayor.

In March, 1984, DeLaurentis was called to a meeting with the mayor to establish a method of controlling unauthorized expenditures. When he arrived, he found Cavallero, Carbone, Mauro, and the mayor. They pressed him to retract his accusations of improper expenditures and to accept bylaws drafted by Cavallero that would make Cavallero a voting member of the commission, make his term longer than the terms of the other commissioners, and eliminate the chairman's and the commission's power to control expenditures, leaving those matters to the executive director, Cavallero. DeLaurentis refused, while agreeing that the bylaws should be changed to improve revenue control. Four days later, DeLaurentis met again with Carbone and Cavallero, who demanded that he agree to the bylaws. Again, DeLaurentis refused. Finally, on April 19, 1984, Carbone renewed the request.

At the commission meeting on April 26, 1984, Cavallero moved for adoption of the proposed bylaws. DeLaurentis objected to these bylaws and reiterated that as he read the charter, Cavallero was not entitled to a vote. When, upon the request of commissioner Schwartz, Goodshall, the assistant corporation counsel, presented her legal opinion that Cavallero was

entitled to a vote, Vegliante and DeLaurentis accused her of collusion with Schwartz and Cavallero and demanded an outside attorney. The minutes of this meeting, like all minutes of the meetings of commissions, were given to the mayor.

On May 3, 1984, the mayor received a letter from commissioners Schwartz and Zeidenberg, to which were attached three written statements signed by Goodshall, Cavallero and Erff. Each stated that at a meeting on October 27, 1983, when candidates for the position of parking authority controller were being considered, DeLaurentis had rejected two of the three candidates presented, saying "No blacks, no women; we need somebody good." The letter from Schwartz and Zeidenberg contained additional accusations: DeLaurentis had violated the freedom of information laws, had made "reckless and irresponsible charges and accusations" against parking authority staff and others without providing substantiation and over the "warnings" of commissioner Schwartz, and had rejected counsel's advice, called her biased and referred to a meeting with the mayor as a "kangaroo court."

Carbone called DeLaurentis and gave him the Schwartz-Zeidenberg letter. He told DeLaurentis that the mayor wanted him to respond before Schwartz went public. DeLaurentis refused, saying only that the letter had been instigated by Cavallero. Two weeks later, on May 16, 1984, the mayor personally called DeLaurentis in and asked again for his response. DeLaurentis, indignant, said only: "My attorney answered it."

The mayor then referred the letters to the city's counsel and asked him to draw up the summons that was subsequently issued to DeLaurentis, which set forth the charges on which the removal proceeding was based. By May 23, news of the proposed charges had been leaked to the media. On May 24, the mayor dis-

closed the charges in a public press release at the Park Plaza hotel. The announcement was covered by a local radio station and was heard by workers in the parking authority offices. Shortly thereafter, DeLaurentis was served with the summons.

The summons, signed by the mayor, contained seven pages of charges, accusing DeLaurentis of being "incompetent" and "unfaithful to the duties of his office," and summoning him, by authority of the city charter, to appear before the mayor at a public hearing there to "show cause why he should not be removed" from office. It advised DeLaurentis that an arbitrator would be appointed "with power . . . to make findings of facts with respect to the statement of charges and recommendations to me as Mayor, as to whether said findings justify or not your removal from said office." The mayor retained, however, the final authority to "review and accept or dismiss" both findings and recommendations.

The summons then set forth four groups of charges against DeLaurentis. The summons charged DeLaurentis with making racist and sexist statements and applying discriminatory standards in hiring employees of the parking authority; making "reckless and unauthenticated accusations and charges" about authority and city personnel "without confirming the truth of [his] charges, and when confronted with the falsity of said accusations and charges, [having] refused to withdraw [his] allegations"; violating the freedom of information act, General Statutes § 1-18 et seq., by initiating and/or chairing executive sessions for improper purposes or by inviting other city employees to those executive sessions; and having "disrupted the business of the Authority by defying the Mayor's request that [he] settle disputes and put issues to rest," specifically, by blocking adoption of the revised bylaws.

DeLaurentis retained an attorney, John R. Williams, his attorney in this case, to defend him at the hearing. The mayor attended the opening of the hearing and left shortly thereafter. Counsel for the mayor called Cavallero as the first witness. When the brief direct examination of Cavallero had concluded, Williams began his cross-examination, which continued for six days. At that point the hearing was postponed to accommodate the vacation plans of Williams and the arbitrator. The hearing, set to resume in September, was postponed again because of trial commitments by both counsel.

In the meantime, one of the commission members, Vegliante, resigned. The mayor appointed Clare DiMartino in his place. That appointment shifted the balance of power on the commission in Cavallero's favor. The new bylaws were passed by a 3—2 vote, and DeLaurentis was subsequently replaced as chairman by commissioner Zeidenberg in November, 1984. The arbitrator resigned in April, 1985, for undetermined reasons. The mayor decided not to resume the hearings, and when DeLaurentis' term of office expired in September, 1987, the mayor did not renew the appointment.

In May, 1984, before the removal proceeding, the plaintiff, Frank DeLaurentis, was seventy-four years old. He was happily married, a jolly, cheerful man who left his troubles at the office and sang at home. As a successful businessman for over fifty years, he was well respected in the community and served on the boards of charitable and civic organizations.

As a result of the public accusations against him and the hearing that followed, DeLaurentis became a changed man. He felt himself to be dishonored and disgraced. He lost his jolly, cheerful manner. He was unable to sleep. His doctor discovered that he had high blood pressure and prescribed pills that he continued

to use until the day of trial. He also received attorney Williams' bill for $10,585 less the $1000 retainer already paid.

In October, 1985, DeLaurentis filed suit in federal court alleging that the mayor, Schwartz, Cavallero and the city had violated 42 U.S.C. § 1983 by conspiring to punish DeLaurentis for asserting his first amendment rights and to deprive him of his position as commissioner and of his good name. On July 1, 1986, that court dismissed his federal claims for failure to state a claim upon which relief might be granted, and declined to exercise pendent jurisdiction over the unspecified state common law claims raised by the facts in the complaint. The court therefore dismissed the pendent claims for lack of federal jurisdiction.

One year after filing his federal complaint, DeLaurentis filed the complaint in this case against the city and the mayor, claiming unspecified violations of the state constitution, malicious prosecution and intentional infliction of emotional distress. The first claim, set forth in two counts, was stricken by the trial court, *Hodgson, J.* The court refused to strike the other counts, however. It rejected the defendants' claims of absolute prosecutorial immunity and res judicata based upon the dismissal of the federal action, and it suggested, without deciding, that the mayor's abandonment of the removal hearings would constitute a "successful termination" of that proceeding, the condition precedent to a malicious prosecution claim. The remaining claims proceeded to trial on September 6, 1989.

After the testimony at trial had concluded, the court, *Downey, J.,* included in its charge to the jury two rulings of law. It instructed the jury that, as a matter of law, initiation of the removal proceeding constituted "litigation" or a "civil action" upon which a malicious

prosecution action[3] could be based. The court also charged that the abandonment of the proceedings satisfied the requirement that the underlying suit have been "terminated favorably" to the malicious prosecution plaintiff. The court gave no charge on either qualified immunity, which the defendants had never raised as a defense, or absolute immunity. The jury returned separate verdicts for the plaintiff as to liability on the vexatious suit and emotional distress claims. In a third verdict on damages, it awarded compensatory damages of $425,000 and punitive damages of $35,000 for both claims combined.

The defendants have appealed and seek a reversal of the judgment, claiming that: (1) the dismissal of DeLaurentis' § 1983 suit bars this action, which arises out of the same events, under principles of res judicata or collateral estoppel; (2) the doctrine of prosecutorial immunity shields the mayor from liability because his institution of the removal proceeding is analogous to the filing of an information in a criminal proceeding; (3) judgment on the vexatious suit claim must be rendered for the defendants because (a) the removal proceeding, on which it is based, is administrative in nature and thus does not constitute a civil action, (b) the proceeding never terminated in favor of the plaintiff, and (c) the evidence established probable cause for

---

[3] The trial court used the term "malicious prosecution." That term usually refers to the malicious instigation, without probable cause, of a criminal prosecution, whereas the term "vexatious suit" more commonly refers to the malicious institution, without probable cause, of a civil suit. The court's use of the term "malicious prosecution" was inconsequential, however. We have held repeatedly that a vexatious suit action brought under General Statutes § 52-568 is governed by the same principles as apply in a malicious prosecution action; *Schaefer* v. *O. K. Tool Co.,* 110 Conn. 528, 534, 148 A. 330 (1930); *Frisbie* v. *Morris,* 75 Conn. 637, 639, 55 A. 9 (1903); compare 3 Restatement (Second), Torts § 675, comment (d); a conclusion that applies equally to a vexatious suit action brought under the common law rather than the statute. See *Vandersluis* v. *Weil,* 176 Conn. 353, 356, 407 A.2d 982 (1978).

instituting the proceeding as a matter of law; and (4) the evidence was insufficient to support the verdict on the claim of intentional infliction of emotional distress. The first issue we must consider is the defendants' assertion that this suit is barred on the grounds of res judicata or, in the alternative, collateral estoppel.

I

In *Virgo* v. *Lyons,* 209 Conn. 497, 551 A.2d 1243 (1988), we held that the close relation between civil rights claims based upon "constitutional" torts and state common law tort actions requires application of the doctrines of res judicata and collateral estoppel in order to prevent relitigation in state courts of matters previously determined in a prior federal civil rights action. Res judicata, of course, bars a party from "reasserting a claim that has already been decided on the merits," while collateral estoppel precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties or those in privity with them. Id., 501. The trial court, *Hodgson, J.,* properly concluded that neither doctrine applies to this case.

The District Court had granted the defendants' motion to dismiss DeLaurentis' federal action pursuant to Rule 12 (b) (6) of the Federal Rules of Civil Procedure.[4] Such a motion is similar to our motion to

---

[4] Rule 12 of the Federal Rules of Civil Procedure provides in pertinent part: "(b) HOW PRESENTED Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under Rule 19. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive plead-

strike; Practice Book § 152; and permits the court to dismiss the complaint for failure "to state a claim upon which relief can be granted." The court in ruling on a 12 (b) (6) motion is required to accept as true all facts pleaded in the complaint and to construe the complaint liberally. *Miree* v. *DeKalb County,* 433 U.S. 25, 27 n.2, 97 S. Ct. 2490, 53 L. Ed. 2d 557 (1977); see 2A J. Moore, Federal Practice (2d Ed.) ¶ 12.07 [2.-5]. By definition, there can be no collateral estoppel "fact preclusion" based upon a successful 12 (b) (6) motion, for no "facts" are either litigated or found.

Secondly, while it is true, as the defendants assert, that "an action for malicious prosecution may support liability under 42 U.S.C. § 1983"; see *Conway* v. *Mount Kisco,* 750 F.2d 205, 214 (2d Cir. 1984); so that a federal court could reject the § 1983 claim if it concluded that the underlying state law claim had not been pleaded adequately under state law, the federal district court reached no such conclusion when it rejected DeLaurentis' § 1983 claims. Instead, it concluded that DeLaurentis had not adequately pleaded deprivation of a constitutionally protected interest. Thus, it never reached the legal sufficiency of the state law claims, if any, underlying his § 1983 claims.

The District Court also did not reach the legal sufficiency of the complaint's independent state law claims. Having already dismissed the federal claim, the court simply declined to exercise pendent jurisdiction over

ing or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, he may assert at the trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

the state law claims that remained. See *United Mine Workers* v. *Gibbs,* 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). "When state law claims are pleaded, and dismissed without reaching their substantive merits, if the dismissal is based on a discretionary refusal to decide them, it does not bar a subsequent suit on the same claims, either in the state court or in another suit in the federal court." 1B J. Moore, Federal Practice ¶ 0.409 [1.-2], p. 311.

## II

The defendants also claim that the doctrine of prosecutorial immunity is applicable to the mayor's action in instituting the removal proceeding and thus foreclosed DeLaurentis' suit. We disagree.

Prosecutorial immunity derives from the immunity attached to judicial proceedings. See *Burns* v. *Reed,* 500 U.S.    , 111 S. Ct. 1934, 1938, 114 L. Ed. 2d 547 (1991). "The judge on the bench must be free to administer the law under the protection of the law, independently and freely, without fear of consequences. No such independence could exist if he were in daily apprehension of having an action brought against him, and his administration of justice submitted to the opinion of a jury." W. Prosser & W. Keeton, Torts (5th Ed.) § 114, p. 816. Were he not immune, " 'no man but a beggar or a fool would be a judge' "; id., n.8, quoting *Miller* v. *Hope,* 2 Shaw, Sc. App. Cas. 125 (1824); because in every suit there is a loser eager to avenge his loss, and in every unsuccessful prosecution there is an accused eager to exact a penalty for his ordeal. See *Forrester* v. *White,* 484 U.S. 219, 225, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988); *Mitchell* v. *Forsyth,* 472 U.S. 511, 521, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985); *Butz* v. *Economou,* 438 U.S. 478, 515, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978); *Bradley* v. *Fisher,* 80 U.S. (13 Wall.) 335, 348, 20 L. Ed. 646 (1872); *Spring* v. *Con-*

*stantino,* 168 Conn. 563, 565, 362 A.2d 871 (1975); *Phelps* v. *Sill,* 1 Day 315, 329 (1804).

The mantle of judicial immunity covers not only judges, but all adjuncts to the judicial process. In particular, prosecutors are immune from tort liability for their conduct as participants in the judicial proceeding. See *Burns* v. *Reed,* supra, 1939; *Imbler* v. *Pachtman,* 424 U.S. 409, 422–24, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976); *Spring* v. *Constantino,* supra, 565; cf. 4 Restatement (Second), Torts § 895D, comment (c) (the immunity extended to public officials such as a prosecuting attorney may not apply to his improper motive). Prosecutorial immunity from suits for malicious prosecution and defamation arose from the similar "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler* v. *Pachtman,* supra, 423. " 'The key to the immunity . . . held to be protective to the prosecuting attorney is that the acts, alleged to have been wrongful, were committed by the officer in the performance of an integral part of the judicial process.' " *Spring* v. *Constantino,* supra, quoting *Robichaud* v. *Ronan,* 351 F.2d 533, 536 (9th Cir. 1965).

"Absolute immunity, however, is 'strong medicine . . . .' " *Forrester* v. *White,* supra, 230, quoting *Forrester* v. *White,* 792 F.2d 647, 660 (7th Cir. 1986) (Posner, J., dissenting). Executive officers, and municipal officers generally, do not share the common law absolute immunity except to the extent that they are engaged in a "judicial" function. W. Prosser & W. Keeton, supra, § 132, p. 1059; 4 Restatement (Second), Torts § 895D (2). Otherwise, "official immunity" is limited to "qualified immunity" for performance of discretionary acts, which may be defeated by a showing

of malice. See, e.g., *Evon* v. *Andrews,* 211 Conn. 501, 505, 559 A.2d 1131 (1989); cf. *Malley* v. *Briggs,* 475 U.S. 335, 340, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns* v. *Reed,* supra, 1939; see also *Malley* v. *Briggs,* supra; *Harlow* v. *Fitzgerald,* 457 U.S. 800, 807, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

The mayor's role in summoning DeLaurentis to refute charges that would remove him from office is similar to the role of a prosecutor in summoning an accused to refute charges that would subject him to imprisonment. The differences between these two roles persuade us, however, to reject the mayor's claim of absolute immunity from tort liability for his actions.

Like a prosecutor, the mayor was the only individual authorized to institute removal proceedings and, in instituting such proceedings, he had a duty to protect the public interest by removing from office an incompetent, corrupt or unfaithful public servant. Like a prosecutor, a mayor might be inhibited in performing this important duty if he feared that his motives would be subjected to scrutiny by an impressionable jury.

Unlike a prosecutor, however, a mayor who institutes the removal proceeding prescribed by the New Haven city charter is also the judge in the case. While the mayor appointed an independent arbitrator to make findings and recommendations, he also, in accordance with the city charter, reserved to himself the ultimate right to reject both findings and recommendations and to decide on his own whether to remove DeLaurentis.[5] While many public *agencies* may wear the "two

---

[5] See footnote 2, supra. Section 220 of article XXXIV of the New Haven City Charter provides in part: "If, after a full hearing, the mayor shall find

hats" of prosecutor and judge—the National Labor Relations Board and local boards of education being two examples—it is unusual to find the same public *official* wearing both hats.

In *Butz* v. *Economou,* supra, the United States Supreme Court held that agency officials who perform functions analogous to those of a prosecutor are entitled to absolute immunity from suit for their decision to initiate or continue a proceeding. In that case, officials from the Department of Agriculture had initiated a proceeding to revoke or suspend the plaintiff's company's commodity futures registration. The plaintiff brought a civil rights action framed as a vexatious suit claim coupled with a demand for damages caused by the officials' press release announcing their action. The facts were quite similar to the facts before us.

In reaching its decision, the United States Supreme Court noted, however, that "federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process." Id., 513. Among these is the requirement that

that the officer in question is corrupt, or incompetent, or unfaithful to the duties of his office, or that the requirements of the public service demand his removal he may remove such person from office, and thereupon shall forthwith file a written order of such removal with the city clerk."

The summons used to initiate the removal proceeding provided in paragraph 7 (b): "That the undersigned as Mayor shall review and accept or dismiss the findings of fact and recommendations de removal or not, as submitted by said referee or arbitrator; and that if said findings de removal are adverse to you, shall remove you from office; and if favorable to you, shall dismiss the charges against you and the proceedings herein."

The first clause of this paragraph expressly authorizes the mayor to "accept or dismiss the findings of fact and recommendations de removal or not, as submitted by said refereee or arbitrator." The second and third clauses, which provide for removal, if the "findings" are adverse, and for dismissal of the charges, if the "findings" are favorable, would not become operative unless the mayor first accepted the findings of the arbitrator. It is clear, therefore, that the mayor never relinquished his power of removal as set forth in the charter.

hearings be "conducted before a trier of fact insulated from political influence." Id. Thus, the court concluded that facts before it met both requirements for a grant of absolute prosecutorial immunity: (1) the need for immunity for the process as a shield against the crippling effect of unlimited vexatious suit actions; and (2) the presence of safeguards against prosecutorial abuse. Id., 511–12. By contrast, in *Malley* v. *Briggs,* supra, the United States Supreme Court rejected a police officer's claim that he should be absolutely immune from liability for causing the plaintiff to be arrested by giving a false affidavit to the judge who issued the warrant. The court analogized the officer to a complaining witness, rather than a prosecutor, and noted that at common law, complaining witnesses have never been absolutely immune, but have always been held liable for malicious prosecution. Id., 340. Finally, the court noted that "[t]he absence of a . . . well-developed and pervasive mechanism for controlling police misconduct weighs against allowing absolute immunity for the officer." Id., 343 n.5.

Comparing *Butz* to the case here illustrates that the existence of other safeguards against the abuse of official power is a necessary prerequisite to absolute prosecutorial immunity. See V. Veeder, "Absolute Immunity in Defamation: Judicial Proceedings," 9 Colum. L. Rev. 463, 470–71 (1909). In *Butz,* those safeguards were provided by federal administrative law requirements that the ultimate decision be reached by one other than the official instituting the proceeding. In a court proceeding, the process itself is also available as a check on prosecutorial abuses.[6] *Burns* v. *Reed,* supra, 1936;

---

[6] Thus, judges and prosecutors are not absolutely immune for actions taken outside the judicial arena. See, e.g., *Burns* v. *Reed,* 500 U.S.    , 111 S. Ct. 1934, 1944–45, 114 L. Ed. 2d 547 (1991) (prosecutor has only qualified immunity from civil rights liability for legal advice given to police); *Forrester* v. *White,* 484 U.S. 219, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988) (judge not immune from civil rights liability for administrative act of firing a probation officer).

see also Practice Book §§ 747, 755, 887 and 986.[7] Moreover, "[t]he organized bar's development and enforcement of professional standards for prosecutors also lessens the danger that absolute immunity will

---

[7] "[Practice Book] Sec. 747. ——SANCTIONS FOR FAILURE TO COMPLY

"If the prosecuting authority fails to comply with Sec. 740 ['Disclosure by the prosecuting attorney'], the judicial authority may, on motion of the defendant or on his own motion, grant appropriate relief, which may include one or more of the following:

"(1) Requiring the prosecuting authority to comply;

"(2) Granting the defendant additional time or a continuance;

"(3) Relieving the defendant from making a disclosure required by Sec. 756, prohibiting the prosecuting authority from introducing specified evidence, or dismissing the charges; or

"(4) Entering such other order as he deems proper."

"[Practice Book] Sec. 755. —— ——FAILURE TO COMPLY WITH ORDER

"If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority, may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in his discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

"[Practice Book] Sec. 886. —— MISTRIAL

"Sec. 887. —— —— FOR PREJUDICE TO DEFENDANT

"Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the procedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case. If there are two or more defendants, the mistrial shall not be declared as to a defendant who does not make or join in the motion."

"[Practice Book] Sec. 984. CRIMINAL CONTEMPT

\* \* \*

"Sec. 986. ——WHO MAY BE PUNISHED

"The judicial authority may punish by fine or imprisonment of both:

"(1) Any person who in the court's presence behaves in a contemptuous or disorderly manner;

"(2) Any person who violates the dignity and authority of any court, or any judicial authority, in its presence or so near thereto as to obstruct the administration of justice;

"(3) Any officer of the court who misbehaves in the conduct of his official court duties; or

"(4) Any person disobeying in the course of a civil or criminal proceeding any order of a judicial authority."

become a shield for prosecutorial misconduct." *Malley* v. *Briggs,* supra, 343 n.5; see also *Mitchell* v. *Forsyth,* supra, 520–23. Judges adhere to similar professional standards. Cf. ABA Code of Judicial Conduct. While there are few safeguards against judicial misconduct, judges cannot ordinarily initiate proceedings, making it less likely that a judge can use the judicial process to harass and intimidate others.[8]

It can be argued that the *political* process is an adequate safeguard against a mayor's misconduct. See W. Prosser & W. Keeton, supra, § 132, p. 1059; cf. *Barr* v. *Mateo,* 360 U.S. 564, 575–76, 79 S. Ct. 1335, 3 L. Ed. 2d 1434, reh. denied, 361 U.S. 855, 80 S. Ct. 41, 4 L. Ed. 2d 93 (1959). Section 220 of the New Haven city charter requires a public hearing prior to removal of an unclassified municipal official. Presumably, the public hearing requirement was intended to keep the process in the public eye as a way of preventing the arbitrary and politically motivated removal of officers. We have never, however, viewed exposure to political repercussions as such a strong deterrent against the abuse of power as to entitle municipal officers to an *absolute* immunity from civil liability, rather than a qualified immunity. See *Stiebitz* v. *Mahoney,* 144 Conn. 443, 446–47, 134 A.2d 71 (1957); see also *Gordon* v. *Bridgeport Housing Authority,* 208 Conn. 161, 166, 544 A.2d 1185 (1988); *Shore* v. *Stonington,* 187 Conn. 147, 155, 444 A.2d 1379 (1982).[9]

---

[8] The New Haven city charter provides for judicial review of an officer's discharge. The officer may be reinstated if the termination was arbitrary and capricious. See footnote 2, supra. Groundless civil suits may also be reversed after appellate review, but that does not entitle those who bring them to enjoy absolute immunity from liability for the damages caused by a vexatious suit.

[9] As these cases indicate, municipal officers are entitled to qualified immunity for their performance of discretionary duties. *Gordon* v. *Bridgeport Housing Authority,* 208 Conn. 161, 166, 544 A.2d 1185 (1988). Because the defendants did not claim qualified immunity as a defense and did not object

We conclude that, although the removal process may resemble a judicial proceeding, it contains insufficient safeguards against abuse to warrant absolute immunity from suit for the mayor, who instituted the process.

## III

We now consider the defendants' claim that the trial court should have granted judgment in their favor on the vexatious suit claim, notwithstanding the jury's verdict in DeLaurentis' favor.

### A

In *Vandersluis* v. *Weil,* 176 Conn. 353, 356, 407 A.2d 982 (1978), we stated: "A vexatious suit is a type of malicious prosecution action, differing principally in that it is based upon a prior civil action, whereas a malicious prosecution suit ordinarily implies a prior criminal complaint. To establish either cause of action, it is necessary to prove want of probable cause, malice and a termination of suit in the plaintiff's favor." The defendants first argue, therefore, that because the removal proceeding in this case was administrative in nature, constituting neither a "civil action" nor a criminal prosecution, institution of the proceeding cannot give rise to liability. We disagree.

Our opinion in *Vandersluis* explores the meaning of "probable cause"; it does not delineate the scope of the "prior action" requirement for vexatious suit liability. Most courts now agree with the Restatement (Second) of Torts, § 680, which permits liability for vexatious "initiation, continuation or procurement of civil proceedings against another before an administrative board that has power to take action adversely affecting the legally protected interests of the other."[10]

---

to the failure of the trial court to include a charge on qualified immunity in its instructions to the jury, we decline to consider the issue, which the defendants mention in a footnote to their appellate brief.

[10] See, e.g., *Melvin* v. *Pence,* 130 F.2d 423, 426–27 (D.C. Cir. 1942) (proceeding to revoke private detective's license); *Hardy* v. *Vial,* 48 Cal. 2d

On the facts of this case, we conclude that DeLaurentis was not barred from bringing a vexatious suit action against the mayor simply because it is based upon a proceeding that did not take place in a courtroom. The removal proceedings prescribed by the New Haven city charter might have resulted in depriving DeLaurentis of his position as a parking authority commissioner. Whether or not his interest in retaining that unpaid position is of constitutional magnitude, a claim rejected by the federal district court, it is a "legally protected interest" in the sense that the city charter restricts the mayor's right to deprive him of it. Compare *Sansone v. Clifford,* 219 Conn. 217, 230–31, 592 A.2d 931 (1991).

B

The defendants next contend that the mayor's decision not to revive the removal proceeding after its extended recess did not constitute a "termination . . .

577, 580–81, 311 P.2d 494 (1957) (administrative termination of professor); *Dixie Broadcasting Corporation* v. *Rivers,* 209 Ga. 98, 105, 70 S.E.2d 734 (1952) (proceedings filed with F.C.C.); *Cassidy* v. *Cain,* 145 Ind. App. 581, 588, 251 N.E.2d 852 (1969) (proceeding before state board of registration to revoke optometrist's license); *Rainier's Dairies* v. *Raritan Valley Farms, Inc.,* 19 N.J. 552, 566, 117 A.2d 889 (1955) (order to show cause why license should not be revoked by Office of Milk Industry); *Groat* v. *Town Board,* 73 App. Div. 2d 426, 429, 426 N.Y.S.2d 339, appeal dismissed, 50 N.Y.2d 928 (1980) (dismissal of police officer by town board after trial before hearing officer); *Donovan* v. *Barnes,* 274 Or. 701, 704–705, 548 P.2d 980 (1976) (student disciplinary proceeding); *Kauffman* v. *A. H. Robins Co.,* 223 Tenn. 515, 523, 448 S.W.2d 400 (1969) (complaint with board of pharmacy); 52 Am. Jur. 2d, Malicious Prosecution § 19 and cases cited therein; compare, e.g., *Chen* v. *Fleming,* 147 Cal. App. 3d 36, 41, 194 Cal. Rptr. 913 (1983) (complaint to bar association that did not lead to initiation of proceedings before body having power to revoke license); *Imig* v. *Ferrar,* 70 Cal. App. 3d 48, 138 Cal. Rptr. 540 (1977) (departmental investigation of police officer that did not lead to formal proceeding); but see *Toft* v. *Ketchum,* 18 N.J. 280, 113 A.2d 671, aff'd on reargument, 18 N.J. 611 (1955) (charges of unprofessional conduct filed with bar association; result later reversed by statute); see 1 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 4.10; W. Prosser & W. Keeton, Torts (6th Ed. 1989) § 120.

in the plaintiff's favor"; *Vandersluis* v. *Weil,* supra, 356; which, they contend, is required to establish liability for vexatious suit.

Courts have taken three approaches to the "termination" requirement. The first, and most rigid, requires that the action have gone to judgment resulting in a verdict of acquittal, in the criminal context, or no liability, in the civil context.[11] The second permits a vexatious suit action even if the underlying action was merely withdrawn so long as the plaintiff can demonstrate that the withdrawal took place under circumstances creating an inference that the plaintiff was innocent, in the criminal context, or not liable, in the civil context.[12] The third approach, while nominally adhering to the "favorable termination" requirement, in the sense that any outcome *other* than a finding of guilt or liability is favorable to the accused party, permits a malicious prosecution or vexatious suit action whenever the underlying proceeding was abandoned or withdrawn without consideration, that is, withdrawn without either a plea bargain or a settlement favoring the party originating the action.[13]

[11] See, e.g., *Schenck* v. *Minolta Office Systems, Inc.,* 802 P.2d 1131 (Colo. App. 1990); *Bonney* v. *King,* 201 Ill. 47, 50, 66 N.E. 377 (1903); *Withall* v. *Capitol Federal Savings of America,* 164 Ill. App. 3d 851, 855–56, 518 N.E.2d 328 (1987), cert. denied, 119 Ill. 2d 576, 522 N.E.2d 1259 (1988).

[12] See, e.g., *Frey* v. *Stoneman,* 150 Ariz. 106, 109, 722 P.2d 274 (1986); *Jaffe* v. *Stone,* 18 Cal. 2d 146, 150, 114 P.2d 335 (1941); *Stanley* v. *Superior Court of Sacramento County,* 130 Cal. App. 3d 460, 463–64, 181 Cal. Rptr. 878 (1982); *Union Oil of California* v. *Watson,* 468 So. 2d 349, 353–54 (Fla. App.), review denied, 479 So. 2d 119 (Fla. 1985); *Carlsen* v. *Oakwood Hills,* 164 Ill. App. 3d 396, 400, 517 N.E.2d 1107 (1987), appeal denied, 119 Ill. 2d 554, 522 N.E.2d 1241 (1988); *Wynne* v. *Rosen,* 391 Mass. 797, 800–801, 464 N.E.2d 1348 (1984); *Mondello* v. *Mondello,* 161 App. Div. 2d 690, 691, 555 N.Y.S.2d 826 (1990); 3 Restatement (Second), Torts § 660, comment (c), and § 674 (b), comment (j).

[13] See, e.g., *Lackner* v. *LaCroix,* 25 Cal. 3d 747, 750, 602 P.2d 393, 159 Cal. Rptr. 693 (1979); *Hurgren* v. *Union Mutual Life Ins. Co.,* 141 Cal. 585, 587, 75 P. 168 (1904); *Crawford* v. *Theo,* 112 Ga. App. 83, 85, 143 S.E.2d 750 (1965) (civil context only); *Joiner* v. *Benton Community Bank,* 82 Ill.

Notwithstanding our recitation of the term *"favorable* termination"* (emphasis added) in *Vandersluis* and a few other cases; see, e.g., *Mozzochi* v. *Beck,* 204 Conn. 490, 495 n.1, 529 A.2d 171 (1987); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole,* 189 Conn. 518, 538, 457 A.2d 656 (1983); *McHale* v. *W.B.S. Corporation,* 187 Conn. 444, 447, 446 A.2d 815 (1982); *Frisbie* v. *Morris,* 75 Conn. 637, 639, 55 A. 9 (1903); we have never required a plaintiff in a vexatious suit action to prove a favorable termination either by pointing to an adjudication on the merits in his favor or by showing affirmatively that the circumstances of the termination indicated his innocence or nonliability, so long as the proceeding has terminated without consideration. See *Zenik* v. *O'Brien,* 137 Conn. 592, 595, 79 A.2d 769 (1951); *See* v. *Gosselin,* 133 Conn. 158, 160, 48 A.2d 560 (1946); *Thompson* v. *Beacon Valley Rubber Co.,* 56 Conn. 493, 499, 16 A. 554 (1888); *Wall* v. *Toomey,* 52 Conn. 35, 39 (1884); *Brown* v. *Randall,* 36 Conn. 56 (1869); *Colli* v. *Kamins,* 39 Conn. Sup. 75, 77, 468 A.2d 295 (1983); 1 Z. Swift, Digest of the Laws of the State of Connecticut p. 497. Instead, we have always viewed the issue of whether the prior outcome was "favorable" to the plaintiff as relevant to the issue of probable cause. *Brown* v. *Randall,* supra, 62.

Two concerns underlie the requirement of "successful termination." The first is the danger of inconsistent judgments if defendants use a vexatious suit or malicious prosecution action as a means of making a collateral attack on the judgment against them or as a counterattack to an ongoing proceeding. *Clewley* v. *Brown Thomson, Inc.,* 120 Conn. 440, 444, 181 A. 531 (1935); see also *Paramount General Hospital Co.* v. *Jay,*

2d 40, 45, 411 N.E.2d 229 (1980); *Wong* v. *Taber,* 422 N.E.2d 1279, 1284 (Ind. App. 1981); *Woodyatt* v. *Bank of Old York Road,* 408 Pa. 257, 182 A.2d 500 (1962); *Robinson* v. *Robinson,* 362 Pa. Super. 568, 575, 525 A.2d 367 (1987), appeal dismissed, 518 Pa. 63, 540 A.2d 529 (1988).

213 Cal. App. 3d 360, 261 Cal. Rptr. 723 (1989); *March* v. *Cacioppo,* 37 Ill. App. 2d 235, 246, 185 N.E.2d 397 (1962); 52 Am. Jur. 2d, Malicious Prosecution § 29. The second is the unspoken distaste for rewarding a convicted felon or otherwise "guilty" party with damages in the event that the party who instituted the proceeding did not at that time have probable cause to do so. See, e.g., *Dukes* v. *New York,* 743 F. Sup. 1037 (S.D.N.Y. 1990); *Katz* v. *Morgenthau,* 709 F. Sup. 1219, 1232 (S.D.N.Y.), aff'd in part and rev'd in part, 892 F.2d 20 (2d Cir. 1989); *Ruff* v. *Eckerds Drugs, Inc.,* 265 S.C. 563, 567, 220 S.E.2d 649 (1975). Thus, an underlying *conviction* is recognized in this state as conclusive proof that there was probable cause for the charges unless it is proven that the conviction was obtained through fraud, duress or other unlawful means. See, e.g., *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole,* supra; *McMahon* v. *Florio,* 147 Conn. 704, 707, 166 A.2d 204 (1960).

In the case before us, it is undisputed that the mayor abandoned the termination proceeding without any negotiation with DeLaurentis and never reopened it. Moreover, DeLaurentis was no longer a parking commissioner at the time he filed his revised complaint against the city, having served out his term. He was never found "guilty" of *any* of the charges against him. We conclude that neither concern underlying the "successful termination" requirement is implicated by permitting DeLaurentis to pursue a vexatious suit action against the defendants.

## C

The third requirement for a vexatious suit action is that the defendant's claims lacked "probable cause." Whether the facts are sufficient to establish the lack of probable cause is a question ultimately to be determined by the court, but when the facts themselves are disputed, the court may submit the issue of probable

cause in the first instance to a jury as a mixed question of fact and law. *Cosgrove Development Co.* v. *Cafferty,* 179 Conn. 670, 671, 427 A.2d 841 (1980); see 3 Restatement (Second), Torts § 681B.

The defendants claim that the trial court should have set aside the jury verdict because the letters received by the mayor on May 3, 1984, provided him with probable cause to institute the proceeding as a matter of law. DeLaurentis argues that the trial court's refusal to do so was proper because the mayor should have undertaken further investigation before instituting the proceedings and that in any event, he actually knew that some of the charges made were not only unfounded, but false.

1

These opposing contentions raise this question: for what must the defendant have lacked probable cause? For filing suit? For asserting a particular cause of action? For alleging particular facts? If a civil plaintiff had probable cause to assert one cause of action but joined to that claim ten others that he knew to be groundless, the victim called upon to defend himself against the ten groundless claims would not suffer less because one good claim was included among them. It is common practice, however, for a plaintiff to allege alternative factual theories when he cannot be sure which version most accurately reflects the events that transpired. Each time a civil plaintiff responds to a request to revise, or amends his complaint after realizing one part of his claim is baseless, must he fear liability for vexatious suit?

"[A]s stated by Lord Mansfield in *Reed* v. *Taylor,* 128 Eng. Rep. 472, 4 Taunt. 516 (CP 1812): '. . . [I]f a man prefers an indictment containing several charges, whereof for some there is, and for others there is not probable cause,' this will 'support a count for prefer-

ring that indictment without probable cause.' " *Gowin* v. *Heider,* 237 Or. 266, 281, 386 P.2d 1 (1964); see also *Janetka* v. *Dabe,* 892 F.2d 187 (2d Cir. 1989); *Graebe* v. *Falcetta,* 726 F. Sup. 36 (E.D.N.Y. 1989); *Singleton* v. *Perry,* 45 Cal. 2d 489, 497, 289 P.2d 794 (1955); *Boogher* v. *Bryant,* 86 Mo. 42 (1885); *Cuthrell* v. *Zayre of Virginia, Inc.,* 214 Va. 427, 428, 201 S.E.2d 779 (1974). We agree with those courts that have applied the same proposition in the civil context. See *Paramount General Hospital Co.* v. *Jay,* supra; *March* v. *Cacioppo,* supra, 247; *Hales* v. *Raines,* 162 Mo. App. 46, 60, 141 S.W. 917 (1911).

In the civil context, what constitutes a separate "charge" for which probable cause is required is not always obvious.[14] Two decisions involving underlying criminal prosecutions are, however, enlightening. In *Janetka* v. *Dabe,* supra, the plaintiff in a malicious prosecution and civil rights action had been acquitted of resisting arrest but convicted of disorderly conduct. Reversing the trial court's dismissal of the plaintiff's malicious prosecution claim, the court noted that he had been "charged with two distinct offenses involving distinct allegations. The disorderly conduct charge involved Janetka's actions directed at the unidentified hispanic man; the resisting arrest charge involved his actions directed at the officers' attempts to arrest him.

[14] In the criminal context, an individual convicted of a more serious charge than the charge on which he was acquitted may not be found to have been "discharged," the prerequisite for a malicious prosecution action predicated upon an underlying criminal prosecution. *See* v. *Gosselin,* 133 Conn. 158, 161, 48 A.2d 560 (1946); *McGann* v. *Allen,* 105 Conn. 177, 134 A. 810 (1926) (discharge requirement); see *Goree* v. *Gunning,* 738 F. Sup. 79, 82–83 (E.D.N.Y. 1990); *Katz* v. *Morgenthau,* 709 F. Sup. 1219, 1232 n.3 (S.D.N.Y.), aff'd in part and rev'd in part, 892 F.2d 20 (2d Cir. 1989); *Ruff* v. *Eckerds Drugs, Inc.,* 265 S.C. 563, 220 S.E.2d 649 (1975); compare *Janetka* v. *Dabe,* 892 F.2d 187, 190 (2d Cir. 1989); *Graebe* v. *Falcetta,* 726 F. Sup. 36 (E.D.N.Y. 1989); *Hickland* v. *Endee,* 574 F. Sup. 770 (N.D.N.Y. 1983); *Cuthrell* v. *Zayre of Virginia, Inc.,* 214 Va. 427, 201 S.E.2d 779 (1974).

The elements of each charge are different; neither charge is a lesser included offense of the other." Id., 190. In *Singleton* v. *Perry,* supra, the court sustained the jury's verdict finding probable cause for a charge in the criminal complaint that the plaintiff had stolen the complainant's auto, but awarding damages because there was no probable cause for the accusation that she had stolen his rings, luggage and other personal items that she claimed he had given her.

The charges against DeLaurentis were divided into four groups, each containing factual allegations with respect to different times, occurrences and actions. Each group of allegations presented essentially one uni-' fied assertion, however: (1) making racist statements and advocating discriminatory employment practices; (2) violating the Freedom of Information Act (FOIA) by misusing executive sessions; (3) making reckless, unauthenticated and false accusations against others and refusing to retract them when "confronted with [their] falsity"; and (4) defying the mayor's request to retract the accusations, settle the parking authority disputes and accept the proposed bylaws. Each group of allegations amounts to a separate "charge" to which DeLaurentis was required to respond.[15]

## 2

In its charge to the jury, the trial court instructed the jurors that they could not find for the plaintiff unless they found that the mayor lacked probable cause for *all* of the charges. In reaching the verdict, therefore, the jury presumably found no probable cause for

[15] Cf. *Fairfield Lumber & Supply Co.* v. *Herman,* 139 Conn. 141, 147, 90 A.2d 884 (1952) (defining "cause of action" in the context of then Practice Book § 7819 [now § 133] as "the single group of facts which gives rise to one or more rights to relief"); see also Practice Book § 386 (authorizing severance of claims and partial summary judgments); Practice Book § 283 (authorizing trial of one or more issues before the others).

any of the charges. We conclude, as a matter of law, that there was probable cause for the first two charges. We agree, however, that the evidence is adequate to support the jury's finding that the mayor lacked probable cause for the other two. Because those charges are logically severable, we conclude that the jury was free to impose liability against the mayor for the damages those charges caused DeLaurentis.[16]

For purposes of a vexatious suit action, "[t]he legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." *Wall* v. *Toomey,* 52 Conn. 35, 36 (1884); accord *Ledgebrook Condominium Assn., Inc.* v. *Lusk Corporation,* 172 Conn. 577, 584, 376 A.2d 60 (1977). "Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Shea* v. *Berry,* 93 Conn. 475, 477, 106 A. 761 (1919). Thus, in the context of a vexatious suit action, the defendant lacks probable cause if he lacks a reasonable, good faith belief in the facts alleged and the validity of the claim asserted. See *Albertson* v. *Raboff,* 46 Cal. 2d 375, 382, 295 P.2d 405 (1956); 3 Restatement (Second), Torts § 662, comment (c), § 675, comment (d); cf. *Franks* v. *Delaware,* 438 U.S. 154, 98 S.

---

[16] There was ample evidence from which the jury could have concluded that the mayor acted with "malice" in making each of the charges. In a vexatious suit action, the defendant is said to have acted with "malice" if he acted primarily for an improper purpose; that is, "for a purpose other than that of securing the proper adjudication of the claim on which [the proceedings] are based"; 3 Restatement (Second), Torts § 676; such as the desire to "occasion expense" to the other party. *Whipple* v. *Fuller,* 11 Conn. 582, 586 (1836). Thus, while malice may be inferred from the lack of probable cause, lack of probable cause may not be inferred from malice. *Vandersluis* v. *Weil,* 176 Conn. 353, 356, 407 A.2d 982 (1978).

Ct. 2674, 57 L. Ed. 2d 667 (1978) (proof that an affiant included a false or reckless statement on a warrant affidavit may void the warrant); compare *State* v. *Hamilton,* 214 Conn. 692, 707 n.6, 573 A.2d 1197, vacated on other grounds,     U.S.    , 111 S. Ct. 334, 112 L. Ed. 2d 299 (1990) (the test for probable cause is objective; an arresting or investigating officer's good faith is insufficient).

### (a)

On May 3, 1984, the mayor received four written statements accusing DeLaurentis of making racist and sexist remarks concerning hiring practices of the parking authority. The Schwartz-Zeidenberg letter contained, in addition to those accusations, most of the allegations included in the other charges against DeLaurentis. After receiving these statements, the mayor's assistant and then the mayor himself asked DeLaurentis to respond, but he refused. Confronted by such accusations, made by presumably reliable public officials and unanswered by DeLaurentis, the mayor unquestionably had probable cause to institute the removal proceeding unless the evidence indicates that he was aware that the allegations were unfounded.

DeLaurentis urges that the jury could have concluded that the mayor was required to undertake a further investigation when he knew that the accusers were DeLaurentis' opponents on the parking authority; was aware of the power struggle in which they were involved; had seen the minutes of the meeting in question, which were silent as to the remarks DeLaurentis was accused of making; knew that the meeting had been attended by a newspaper reporter as well as by a confidant of the mayor's, neither of whom had reported to him that DeLaurentis had made the improper remarks; and must have been aware that the meeting at which DeLaurentis was claimed to have

made the remarks had taken place in October, 1983, six months earlier than the letters that he received in May, 1984. He points to statements signed by commissioners Vegliante, Piurek and development director John Sawyer to the effect that they had not heard DeLaurentis make the remarks, which were introduced into evidence to prove what the mayor would have heard had he asked others present at the October meeting what DeLaurentis had said.

"If a person who has received information tending to show the commission of a crime fails to make such further inquiry or investigation as an ordinarily prudent man would have made in the same circumstances before instituting a proceeding, such failure renders him liable for proceeding without probable cause. One may not rely without further investigation on representations of another where the information received is such as to put an ordinarily prudent and cautious person on inquiry, or, it has been held, where he has no personal knowledge of the truth of the representations. So, also, there is authority to the effect that to proceed without inquiry would be to act without probable cause where the information is readily obtainable, or where the accused himself points out sources of information that would establish his innocence." 52 Am. Jur. 2d, Malicious Prosecution § 54; see also *Zitkov* v. *Zaleski,* 102 Conn. 439, 446, 128 A. 779 (1925); *Flam* v. *Lee,* 116 Iowa 289, 298, 90 N.W. 70 (1902); compare *Babb* v. *Minder,* 806 F.2d 749 (7th Cir. 1986), and *Jones* v. *Britt Airways, Inc.,* 622 F. Sup. 389, 392–93 (N.D. Ill. 1985) (failure to investigate may be evidence of malice sufficient to overcome qualified privilege).

The defendants correctly point out that the mayor *did* make inquiry: he twice confronted DeLaurentis with the accusations and received no response.[17] While

---

[17] The defendants also claim that the charges were based on an "investigation" by the corporation counsel's office. The charges themselves state

it is possible that the mayor never believed the accusations regarding the racist and sexist remarks were truthful and retained that belief even after DeLaurentis' failure to respond, there is no evidence from which such a state of mind can be inferred. The mayor's denial at trial of any such belief cannot form the basis for such an inference. " 'Facts cannot be established by not believing witnesses who deny them.' " *State* v. *Poplowski,* 104 Conn. 493, 495, 133 A. 671 (1926); see also *State* v. *Mayell,* 163 Conn. 419, 426–27, 311 A.2d 60 (1972).[18] Given that public officials in these times have a duty to eliminate discriminatory hiring practices, we conclude that when information concerning them is received from presumably reliable sources, there is probable cause to institute a removal proceeding such as the one established by the New Haven city charter.

### (b)

DeLaurentis was also charged with repeated violations of the FOIA by either initiating or chairing executive sessions of the parking authority during which prohibited subjects were discussed or at which nonmembers were permitted to be present. The Schwartz-Zeidenberg letter and the minutes of those sessions provide sufficient evidence to support these accusations. It is significant that DeLaurentis never denied them.

The issue raised, however, is not whether the mayor had reasonable grounds to believe that the *facts* alleged

---

that they are based on minutes of meetings and oral statements made by unnamed persons. Whether or not the claimed investigation actually took place, however, the letters, together with DeLaurentis' refusal to refute them, were sufficient to amount to probable cause absent the mayor's knowledge or belief that the charges were baseless.

[18] Because we reject as a matter of law the jury's conclusion that the mayor lacked probable cause for this charge, any error in admitting into evidence the hearsay statements by Piurek, Vegliante and Sawyer, which DeLaurentis introduced to show what information contradicting the charges would have been readily available to the mayor had he undertaken an investigation, is harmless.

were true, but whether he had cause to believe also that the facts alleged would constitute grounds for DeLaurentis' discharge. DeLaurentis appears to claim that FOIA violations constituted inadequate grounds to discharge him when others, including the mayor himself, participated in the violations without suffering the same penalty. We agree that it is incongruous to allow one to charge another with the same wrongful act that he also has committed. Probable cause does not, however, require a blameless accuser. It is the rare prosecutor of traffic violations who has never himself committed such an offense. Under these circumstances, the FOIA violations alone may not have been a sufficient basis for removal of DeLaurentis. It was not improper to include them with the other charges, however, because there was probable cause to believe that they had occurred, and they added some weight to the basic claim that DeLaurentis should be removed for incompetence. The decision to remove him might properly have been based on the cumulative import of all of the charges.

(c)

With respect to the charge of making reckless accusations, however, there was sufficient evidence from which the jury could have concluded that the mayor *actually knew* the accusations were false.

The summons alleges, in pertinent part: "You have made reckless and unauthenticated accusations and charges about Parking Authority employees, other Authority members, and officers of the City, without confirming the truth of your charges, and when confronted with the falsity of said accusations and charges, have refused to withdraw your allegations." It then recites particular charges made by DeLaurentis as being "untrue." Noteworthy is the allegation that "[y]ou have stated that 'the Temple Street Garage cashiers were stealing' and that the Executive Director should 'fire them all,' which charge is untrue. When

reminded that recent investigations of Authority practices found no substantial improprieties which had not previously been addressed by the Authority, you have failed to withdraw your charges and, in fact, have continued to make vague and unsubstantiated charges regarding employee dishonesty." Other assertions made by DeLaurentis are characterized as "untrue," "false," "unsubstantiated" or contradicted by "an independent investigation by the New Haven Police Department which found no substantial improprieties which had not previously been addressed by Authority management."

The jury could reasonably have found, however, that prior to issuing this charge, the mayor had seen both the Prokop report and the vouchers DeLaurentis had uncovered. Both tended to substantiate DeLaurentis' accusations. Indeed, the mayor himself admitted that the Prokop report contained findings that suggested a pattern of stealing by parking authority employees. The mayor's refusal to review the vouchers DeLaurentis offered as evidence amounts to the sort of "wilful blindness" that exceeds a simple failure to investigate. The jury could also have concluded that the mayor knew that his own brother had witnessed misuse of parking lot stickers by friends of Cavallero. This evidence was sufficient for the jury to conclude that a reasonable person would not have had probable cause to charge DeLaurentis with making false and unsubstantiated accusations.

### (d)

Finally, DeLaurentis was accused of defying the mayor and blocking adoption of the proposed bylaws. DeLaurentis conceded that he defied the mayor's order that he withdraw his accusations, accept the bylaws, and make peace with the other commissioners. As a matter of law, however, his actions in this respect could not have been grounds for his discharge because, as

the mayor admitted, the parking authority is a separate entity not subject to the mayor's control. Knowing this, as the mayor admittedly did, the mayor could not reasonably have believed that DeLaurentis' defiance was a lawful basis for discharging him as "incompetent" or being "unfaithful to the duties of his office."

We conclude that there was sufficient evidence from which the jury could find that the charges involving reckless accusations and defiance of the mayor lacked probable cause, but insufficient evidence from which the jury could find that the charges concerning discriminatory remarks and FOIA violations lacked probable cause. We believe that these charges are logically severable and that DeLaurentis established the city's and the mayor's liability for the injury suffered by being summoned to defend himself against those charges for which probable cause was lacking.[19]

## IV

The defendants next challenge the trial court's refusal to direct a verdict, or to set aside the jury's ver-

---

[19] The defendants have challenged the trial court's refusal to allow them to amend their answer to deny an allegation in the complaint that the mayor had accused DeLaurentis of being "corrupt." Whether to allow amendment of pleadings is a decision that rests in the sound discretion of the trial court, which may decline to do so if the amendment would unfairly prejudice the other party. *Farrell* v. *St. Vincent's Hospital*, 203 Conn. 554, 561–62, 525 A.2d 954 (1987). In this case, the trial court expressly advised the jury that in finding the facts they were *not* bound by the defendants' answer "admitting" that the mayor had charged DeLaurentis with being "corrupt," so that the error, if any, was harmless.

The defendants also claim that the trial court improperly refused to submit their proposed special interrogatories to the jury. Those interrogatories required the jury to specify its conclusions with respect to each element of a vexatious suit action. The jury had already been asked to render separate verdicts on the vexatious suit and emotional distress claims. The trial court's decision was within its sound discretion. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole*, 189 Conn. 518, 527, 457 A.2d 656 (1983). The defendants did *not* ask the jury to make separate findings of probable cause for each charge contained in the summons.

dict, on the plaintiff's intentional infliction of emotional distress claim. Specifically, the defendants argue that the mayor's conduct did not constitute "extreme and outrageous" conduct as a matter of law. While we agree that the jury's verdict on that claim must be set aside, we do so for a reason that is different from those offered by the defendants. We conclude that statements contained in the summons and statement of charges are absolutely privileged at common law and that no cause of action for intentional infliction of emotional distress based on those statements can lie.[20]

## A

The summons and statement of charges with which DeLaurentis was served are analogous to a summons and complaint in a civil suit or an information in a criminal case.[21] The common law protects allegations in a complaint with an "absolute privilege."[22] See *Brisco v. LaHue,* 460 U.S. 325, 330–31, 334–35, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983); *Petyan v. Ellis,* 200 Conn. 243, 245–47, 250, 510 A.2d 1337 (1986); *Blakeslee & Sons v. Carroll,* 64 Conn. 223, 232, 29 A. 473 (1894); 2 F. Harper, F. James & O. Gray, Torts (2d Ed.) § 5.22, pp. 189–90; W. Prosser & W. Keeton, Torts (5th Ed.) § 114 (1), p. 817; V. Veeder, "Absolute Immunity in Defamation: Judicial Proceedings," 9 Colum. L. Rev. 463, 477–79 (1909); but see *Mauney v. Millar,* 142 Ark. 500, 502–503, 219 S.W. 1032 (1920); *Barnett v. Loud,* 226 Mass. 447, 115 N.E. 767 (1917) (absolute privilege does not extend to statements irrelevant to the sub-

[20] First amendment concerns may also be implicated when the sole basis for a claim of intentional infliction of emotional distress is a publication or statement criticizing the conduct of a public official. See *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988).

[21] See Part III of this opinion for a full discussion of this issue.

[22] To the extent that this court's opinion in *Blakeslee & Sons v. Carroll,* 64 Conn. 223, 233, 29 A. 473 (1894), restricted the absolute privilege to statements to or before a court established by law in which rights may finally be determined; id.; it has been overruled by *Petyan v. Ellis,* 200 Conn. 243, 510 A.2d 1337 (1986).

ject of the suit). Thus, whether or not a party is liable for "vexatious suit" in bringing an unfounded and malicious action, he is not liable for the words used in the pleadings and documents used to prosecute the suit.

The common law privilege for statements is similar to the absolute immunity afforded to participants in a judicial proceeding. Witnesses and parties to judicial proceedings must be permitted to speak freely, without subjecting their statements and intentions to later scrutiny by an indignant jury, if the judicial process is to function. *Petyan* v. *Ellis*, supra, 246. While no civil remedies can guard against lies, the oath and the fear of being charged with perjury are adequate to warrant an absolute privilege for a witness' statements.[23] Parties or their counsel who behave outrageously are subject to punishment for contempt of the court. Parties and their counsel who abuse the process by bringing unfounded actions for personal motives are subject to civil liability for vexatious suit or abuse of process. See *Mozzochi* v. *Beck,* 204 Conn. 490, 494–95, 529 A.2d 171 (1987); see also *Albertson* v. *Raboff,* 46 Cal. 2d 375, 382, 295 P.2d 405 (1956) (distinguishing libel actions and vexatious suit actions based upon allegations in a complaint). Their statements in pleadings or in court, however, cannot independently be made the basis for an action in libel; *Mozzochi* v. *Beck,* supra, 494–95; or, we now hold, intentional infliction of emotional distress.

Because the summons and statement of charges in this case was the functional equivalent of a civil com-

[23] In *Petyan* v. *Ellis,* 200 Conn. 243, 247–48, 510 A.2d 1337 (1986), we held that an employer's statement on a "fact-finding supplement" form provided by the employment security division of the state labor department was protected by the absolute privilege reserved for witnesses in a judicial proceeding because it was within the labor department's power to subpoena the employer. Id., 251. We note that an employer who gives a false statement in order to reduce his contributions to the unemployment compensation fund; see id., 258 *(Santaniello, J.,* dissenting); may be subjected to criminal penalties. See General Statutes § 31-273 (d).

plaint or pleading, we conclude that the particular statements contained within it are absolutely privileged and cannot, in and of themselves, support an action for intentional infliction of emotional distress any more than they could have supported an action for libel.[24] Cf. *Hogen* v. *Valley Hospital,* 147 Cal. App. 3d 119, 195 Cal. Rptr. 5 (1983); *Rainier's Dairies* v. *Raritan Valley Farms, Inc.,* 19 N.J. 552, 563, 117 A.2d 889 (1955). As discussed in Part III of this opinion, an appropriate safeguard is available in the form of a vexatious suit action for unfounded charges.

DeLaurentis also claims that the mayor's conduct in "publicizing his false accusations" by way of a press conference and news broadcast was "particularly painful and humiliating to Mr. DeLaurentis." DeLaurentis has produced *no* evidence, however, that the mayor made any public statements about him other than his public reading of the charges, which was broadcast by a local radio station. There is absolutely nothing in the record, which includes many newspaper articles offered by the plaintiff, to indicate that the mayor made any comments of his own.

In *Barr* v. *Mateo,* supra, the United States Supreme Court immunized from defamation liability an executive officer who issued a public statement, not contained in a pleading, discussing the impending discharge of a subordinate official. By contrast, many courts have

[24] If the constitutional standards for a defamation action based on publications about a public official or public figure are also applicable to actions for intentional infliction of emotional distress based upon such publications, it is by no means clear that mere allegations in a pleading could ever reasonably be interpreted as *stating* actual facts about the public figure involved; *Hustler Magazine* v. *Falwell,* 485 U.S. 46, 56, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988); because the context in which they are made indicates that the speaker intends the veracity of the allegations to be tested by a judicial or quasijudicial process, not merely by the uncertain forces at work in the marketplace of ideas. Allegations, by definition, are not statements of fact. See *Petyan* v. *Ellis,* 200 Conn. 243, 259, 510 A.2d 1337 (1986) (*Santaniello, J.,* dissenting).

refused to apply the absolute privilege for statements contained in pleadings when copies of the pleadings are circulated to parties unconnected with the judicial proceeding, including the media. *Asay* v. *Hallmark Cards, Inc.,* 594 F.2d 692, 697 (8th Cir. 1979) (Iowa law); *Abbott* v. *United Venture Capital, Inc.,* 718 F. Sup. 823, 828 (D. Nev. 1988) (Nevada law); *Williams* v. *Williams,* 23 N.Y.2d 592, 599, 246 N.E.2d 333, 298 N.Y.S.2d 473 (1969) (New York law). Where the subject of the pleadings is the conduct of a public official, the public is, however, inevitably connected with the proceeding. Thus, without choosing between these two positions, we believe that the absolute privilege afforded statements in pleadings protects a mayor from liability for the infliction of emotional distress caused when he repeats to the media statements contained in a formal summons instituting a proceeding for the removal of a public official after a public hearing.

### B

Our conclusion that neither the statement of the charges in the summons nor the mayor's recital of them to the media can provide any basis for the claim of extreme emotional distress leaves as the only possible ground for such a claim the mayor's action in instituting a vexatious suit by including in the summons two charges that the jury reasonably found to have been baseless. Arguably, the jury might have based a judgment of intentional infliction of emotional distress on that vexatious suit if the other requirements for an emotional distress action were met.

" 'In order for the plaintiff to prevail in a case for liability under . . . [the intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outra-

geous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. *Hiers* v. *Cohen,* 31 Conn. Sup. 305, 329 A.2d 609 (1973); 1 Restatement (Second), Torts § 46.' " *Petyan* v. *Ellis,* supra, 253, quoting *Murray* v. *Bridgeport Hospital,* 40 Conn. Sup. 56, 62, 480 A.2d 610 (1984).[25] Liability for intentional infliction of emotional distress requires " 'conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.' " *Petyan* v. *Ellis,* supra, 254 n.5, quoting W. Prosser & W. Keeton, Torts (5th Ed.) § 12, p. 60. Thus, "[i]t is the intent to cause injury that is the gravamen of the tort"; *Hustler Magazine* v. *Falwell,* 485 U.S. 46, 53, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988); whereas lack of probable cause is the gravamen of the tort of vexatious suit. See *Vandersluis* v. *Weil,* supra, 356.

In this case, however, we need not decide whether the plaintiff's evidence satisfies all the requirements for a recovery for intentional infliction of emotional distress. As the only basis for such a claim is the vexatious suit with respect to the two charges for which probable cause was lacking, our determination that the defendants' liability for bringing those charges has been established makes any additional theory supporting the imposition of liability for the same act entirely superfluous. The plaintiff cannot recover any greater damages if liability can also be based on extreme emotional distress.[26] Since the only viable basis for that claim is

[25] If the "conduct" underlying the claim of intentional infliction of emotional distress is a defamatory publication concerning a public figure, the plaintiff must also prove that the defendant acted with the standard of malice applicable to defamation actions set forth in *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), and its progeny. See *Hustler Magazine* v. *Falwell,* 485 U.S. 46, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988).

[26] Punitive damages are permissible in a vexatious suit action. *Vandersluis* v. *Weil,* 176 Conn. 353, 358, 407 A.2d 982 (1978). "Punitive damages are awarded when the evidence shows a reckless indifference to the rights of

the vexatious suit, the damages resulting therefrom would not be enhanced if we were to conclude that liability may also be predicated thereon.

## V

Our remand requires only a hearing in damages on the vexatious suit count during which DeLaurentis must prove the damages attributable to the vexatious charges against him. Ordinarily the reversal of a jury verdict requires a new trial of all the issues in the case. "Where the error as to one issue . . . is separable from the general issues, the new trial may be limited to the error found, provided that such qualification or limitation does not work injustice to the other issues or the case as a whole." *Murray* v. *Krenz,* 94 Conn. 503, 507, 109 A. 859 (1920). "But where the retrial of the single issue may affect the other issues to the prejudice of either party, the court will not exercise its discretion in limiting the new trial but will grant it *de novo*." (Emphasis in original.) Id., 508. We have applied this principle in ordering retrials on both liability and damages when there was reason to believe that a verdict, so low in relation to the injuries sustained in a negligence case that reversal is warranted, may have resulted from a compromise reached by the jurors on the issue of liability. *Fazio* v. *Brown,* 209 Conn. 450, 457, 551 A.2d 1227 (1988); *Malmberg* v. *Lopez,* 208 Conn. 675, 682–83, 546 A.2d 264 (1988); *Johnson* v. *Franklin,* 112 Conn. 228, 232, 152 A. 64 (1930); *Murray* v. *Krenz,* supra. The verdict in the present case for $425,000 of compensatory damages and $35,000 of punitive damages does not indicate any disagreement among the jurors as to liability. Furthermore, having been instructed by the trial court that liability for vexatious suit could not be found unless *all* of the charges

---

others or an intentional and wanton violation of those rights." Id. Thus, evidence of the mayor's intent that would have been relevant to the plaintiff's action for intentional infliction of emotional distress would also be relevant to his claim for punitive damages in the vexatious suit action.

in the summons lacked probable cause, the jurors must be presumed to have evaluated each of them independently and to have concluded that all of them were baseless. There is no reason, therefore, to suspect that the jury's finding of liability with respect to the two vexatious suit claims that are adequately supported by probable cause would not have been made if evidence concerning the two unsupported charges had not been presented. Such evidence may well have affected the award of damages, upon which we order a retrial, but cannot reasonably be deemed to have affected the determination of liability with respect to the two viable charges.

Some courts have held that it is the defendant in a vexatious suit who must apportion the damages when his vexatious charges were joined with meritorious charges, because it is the mingling of the two that makes apportionment difficult. See, e.g., *Singleton* v. *Perry,* supra, 498; *Boogher* v. *Bryant,* supra, 50–51. We believe, however, that the plaintiff in a vexatious suit action, like any other plaintiff, has the burden of proving damages. Compare *Connecticut Building Wrecking Co.* v. *Carothers,* 218 Conn. 580, 608–609, 590 A.2d 447 (1991) (where joint *tortfeasors* cause harm to the plaintiff, they, not the plaintiff, have the burden of apportioning the liability for that harm among them). The plaintiff need not, however, "divide his damages between the [accusations] with delicate nicety." *Boogher* v. *Bryant,* supra, 50.

We need not address at this time the defendants' claim that the court should have granted a remittitur as to the compensatory damages awarded, because those damages will have to be redetermined.[27] The jury

---

[27] Had DeLaurentis brought this action under General Statutes § 52-568 (a), he would have been entitled to an award of double his compensatory damages, or treble damages if the jury found he had proved "actual" malice, that is, had proven malice by means of evidence with respect to the mayor's mental state and not only by the inference arising from making charges without probable cause. Having chosen not to bring his action under the statute, he is foreclosed from relying on it at this time. Practice Book § 109A.

will also have a new opportunity to decide whether to award punitive damages.

We affirm the judgment based on the verdict imposing liability for a vexatious suit to the extent that it is based upon the inclusion of charges against DeLaurentis of having made reckless accusations against others and having refused to comply with the mayor's orders. We remand the case for a hearing to ascertain the damages resulting from the wrongful inclusion of those charges as a basis for the removal proceeding.

We reverse the judgment based on the verdict imposing liability for intentional infliction of emotional distress because of the failure to confine its basis to the inclusion of the two charges upon which we have sustained the verdict of liability for vexatious suit. No further proceedings on this claim are necessary.

The verdict for damages must be set aside because of the failure to limit the award to those damages resulting from the inclusion of the two charges for which there was no probable cause.

The judgment is reversed in part and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other justices concurred.