[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a Memorandum of Decision in a trial to the court. The parties claimed this matter for the jury list. The jury had been selected and after jury selection all parties agreed to try this matter to the court.
PROCEDURAL MATTERS
The lawsuit was returnable to the Stamford Superior Court on January 9, 1996, in an original four count complaint. The two original plaintiffs were Stephanie W. Shea and her former husband, Michael P. Shea. They sued in four counts. In the First count Stephanie W. Shea sued Chase Manhattan Bank, N.A. (Chase) for statutory vexatious litigation in violation of General Statutes § 52-568. Her husband, Michael Shea, was not a named plaintiff in that count. The remaining three counts against Chase involved both plaintiffs. The Second count alleged a Connecticut Unfair Trade Practices Act (CUTPA) violation. The Third count alleged intentional infliction of emotional distress and the Fourth count alleged common law vexatious litigation. A Motion to CT Page 3325 Strike was granted as to the Third and Fourth counts. Michael P. Shea was eliminated as a plaintiff. Therefore the case proceeded to trial with Stephanie W. Shea (Shea) as the only plaintiff on the remaining First and Second counts.
The defendant filed an answer and four special defenses. The special defenses alleged (1) unclean hands, (2) statute of limitations as to the CUTPA counts for events occurring prior to December 19, 1992, (3) statute of limitations as to the statutory vexations litigation count and (4) advice of counsel relied on by the defendant. This court granted the plaintiff's motion for summary judgment as to the two special defenses involving the statute of limitations. The trial proceeded on the First and Fourth special defenses.
CLAIMS OF LAW
The basis of the plaintiff's claim against Chase is vexatious litigation, Chase filed a Connecticut Superior Court action against Shea alleging fraud in 1989. After years of litigation the lawsuit was withdrawn by Chase on May 2, 1994. Shea claimed tens of millions of dollars in damages. Her house in Darien was attached and after a 13 day hearing the attachment was ordered released. Chase unsuccessfully appealed that ruling to the Appellate Court and to the Supreme Court. She spent substantial money for attorney fees. She lost real estate profits and capital gains. Shea sustained damage to her reputation. She suffered pain and suffering, anxiety, lost earnings, lost earning capacity, loss of opportunity in her chosen field of expertise, break up of her marriage and severe emotional distress. Wochek v. Foley,193 Conn. 582, 588 (1984). She claims that Chase instituted the underlying fraud lawsuit to encourage her to cooperate so Chase could access other assets and offshore holdings of Antonino Castellett. The withdrawn lawsuit is the basis of the statutory vexatious litigation claim and also supports the CUTPA claim. This Memorandum of Decision will discuss facts in a later section. The court will now turn to a discussion of law applicable Shea's claims and the defendant's special defenses.
The plaintiff commenced this lawsuit based upon common law vexatious litigation as well as statutory vexatious litigation. This case was only tried on statutory vexatious litigation. "Any person who commences and prosecutes any civil action or complaint against another, in his own name or the name of others, or asserts a defense to any civil action or complaint commenced and CT Page 3326 prosecuted by another (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages." General Statutes §52-568. Plaintiff is seeking both double damages under §52-568 (1) and treble damages under § 52-568 (2). Both of those claims are contained in the First count.
Under the first claim for double damages plaintiff must prove the following to recover: (1) the suit complained of terminated in her favor and (2) there was a want of probable cause in the commencement and/or prosecution of the lawsuit by the defendant. If these two elements are proven under the statute the plaintiff is entitled to double damages. In the event the plaintiff is successful in proving: (1) the underlying lawsuit was terminated in her favor, (2) commenced and/or prosecuted without probable cause, and(3) with a malicious intent unjustly to vex and trouble such other person, under the statute the plaintiff is entitled to treble damages. The plaintiff has claimed both double and treble damages and offered evidence in support thereof in her case in chief.
Actions of vexatious litigation are not commonly found in the Connecticut courts. Connecticut has three closely related actions for the tort of misuse of the legal system; malicious prosecution, vexatious suit and abuse of process. McGann v.Allen, 105 Conn. 177, 185 (1926). Malicious prosecution is a civil cause of action for the bringing of a criminal action with malice and without probable cause. Vandersluis v Weil,176 Conn. 353, 356 (1978). Vexatious litigation is a similar civil action differing primarily in that it is based upon a prior civil action. Id. Abuse of process is the misuse or subversion of a properly instituted process for an improper or ulterior purpose.Schaefer v. O.K. Tool Co., 110 Conn. 528, 532 (1930).
In 1930, Connecticut first differentiated vexatious litigation arising out of a prior civil action from malicious prosecution arising out of a prior criminal action. Calvo v. Bartolotta,112 Conn. 396, 397 (1930). The two leading cases in Connecticut on the subject of vexatious litigation are Vandersluis v. Weil, supra, 176 Conn. 356 and DeLaurentis v. New Haven, 220 Conn. 225
(1991). Both discussed common law vexatious litigation. Although there has been generally three elements in vexatious litigation suits, DeLaurentis and Vandersluis break them down into four elements: (1) The defendant initiated or procured the institution CT Page 3327 of civil proceedings against the plaintiff; (2) The civil proceedings have terminated in favor of the plaintiff; (3) The defendant acted without probable cause; and (4) The defendant acted with malice, primarily for a purpose other than obtaining civil money damages. LoSacco v. Young, 20 Conn. App. 6, 19
(1989). All four elements of common law vexatious litigation are found in statutory vexatious litigation. If the first three elements are proven the plaintiff is entitled to statutory double damages. General Statutes § 52-568 (1). If the fourth element of malice is proven, the plaintiff is entitled to treble damages. General Statutes § 52-568 (2). A statute similar to this has been in effect in Connecticut since 1672. (Rev. of 1808 p. 671)Frisbie v. Morris, 75 Conn. 637 (1903).
The key element in vexatious litigation is the lack of probable cause in the underlying action. Probable cause has been defined as "knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds for prosecuting an action." Vandersluis v. Weil, supra, 176 Conn. 356. There must be proof of lack of probable cause apart from that of malice. The mere fact that there is malice is insufficient itself to prove lack of probable cause. Id. The proof of probable cause in commencing and/or prosecuting the underlying lawsuit is an absolute defense against an action for malicious prosecution. Id. This rule applies also to vexatious litigation. If the plaintiff fails to prove lack of probable cause, it is fatal to her claims in this lawsuit.
Whether the facts of the underlying case are sufficient to support a finding of probable cause is usually a question of law for the court. DeLaurentis v. New Haven, supra, 220 Conn. 252. In this case, the facts of the underlying suit, in which Chase sued Shea, were in dispute. Since this originally was a jury case, this court intended to submit the issue of lack of probable cause to the jury as a mixed question of fact and law. DeLaurentis v.New Haven, supra, 220 Conn. 252-53. Cosgrove Development Co. v.Cafferty, 179 Conn. 670, 671 (1980) After withdrawal from the jury, this mixed question of fact and law is now a matter for the this trial court to decide.
Vandersluis v. Weil, is still the law of Connecticut, having been last cited in Norse Systems, Inc. v. Tingley Systems, Inc.,49 Conn. App. 582 (1998). "A vexatious suit is a type of malicious prosecution action, differing principally in that it is based on a prior civil action, whereas a malicious prosecution CT Page 3328 suit ordinarily implies a prior criminal complaint. To establish either cause of action, it is necessary to prove want of probable cause, malice and a termination of suit in the plaintiff's favor. . . . Probable cause is the knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds for prosecuting an action. . . . Malice may be inferred from lack of probable cause. . . . The want of probable cause, however, cannot be inferred from the fact that malice was proven . . . The existence of probable cause is an absolute protection against an action for malicious prosecution, and what facts, and whether particular facts, constitute probable cause is always a question of law." Vandersluis v. Weil, supra,176 Conn. 356. The rules of common law vexatious litigation and statutory vexation litigation appear to be quite similar. DeLaurentis v.New Haven, supra, 220 Conn. 238, n. 3.
There are a number of concepts of probable cause found in law. When or where probable cause has been established has vexed criminal and civil courts alike. State v. Glenn, 251 Conn. 567,576-71 (1999). This court has found no authority for the proposition that the standard of probable cause under General Statutes § 52-568 is different than the standard of probable cause in common law vexatious litigation. The court is going to apply the following standard for probable cause: "It is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." Wall v. Toomey, 52 Conn. 35, 37 (1884).Morgillo et. al. v. Loeb, Superior Court, judicial district of New Haven at New Haven, Docket No. CV 95-0371591S (December 4, 1996, Corradino, J) 1996 Ct. Sup. 7363, 7366; Shea v. Berry,93 Conn. 475, 477 (1919); Zitikov v. Zaleski, 102 Conn. 439, 446
(1925).
The first element of vexatious litigation is that the underlying action was commenced by the defendant. All parties concede that the underlying action was commenced in the Superior Court at J.D. of Stamford by Chase against Shea alleging fraudulent conduct. Chase Manhattan Bank vs. Stephanie W. Shea, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. CV 89-0103197 S.
The second element of vexatious litigation is whether or not the underlying civil lawsuit terminated in favor of the plaintiff, Shea. There are three different approaches in CT Page 3329 establishing the element of termination of the underlying action in favor of the plaintiff: (1) The underlying civil case went to judgment and there was a finding of no liability, (2) The underlying civil case was withdrawn where the plaintiff can demonstrate that this occurred under circumstances inferring that the plaintiff was not liable, and (3) The underlying civil action was withdrawn or abandoned by the defendant without consideration or settlement favoring the defendant. DeLaurentis v. New Haven, supra, 220 Conn. 250-51. Connecticut follows the third approach. Id 251.
The court finds that there were discussions among the parties just prior to the defendant's withdrawal of the action. The defendant filed a withdrawal of the underlying lawsuit on May 2, 1994. Exhibit 68. This court finds that there was no evidence whatsoever that any of the discussions came to fruition nor was there any consideration for the withdrawal of the lawsuit. This court finds that Chase withdrew the underlying civil lawsuit because of the considerations of costs of trial and inability to collect any judgment from Shea. The trial had been scheduled to commence in a few months. This court finds that there was no consideration tendered to the defendant for the withdrawal. There was no settlement. The court finds that at the time of the withdrawal Chase was of the opinion that it still had a good claim against Shea but it was cost prohibitive to prosecute the lawsuit in light of her poor financial situation. These findings lead this court to conclude the plaintiff has established that the termination of the underlying civil action was in her favor and that the second element of vexatious litigation has been established. The plaintiff still must prove lack of probable cause to establish double damages and malice to establish treble damages.
Chase has filed a special defense of advice of counsel. "Advice of counsel is a complete defense to an action of . . . vexatious suit when it is shown that the defendant . . . instituted his civil action relying in good faith on such advice, given after a full and fair statement of all facts within his knowledge, or which he was charged with knowing." Vandersluis v. Weil, supra,176 Conn. 361; Norse Systems, Inc. v. Tingley Systems, Inc., supra, 49 Conn. App. 596. It is an applicable special defense to a statutory vexation litigation action. Id. 596. "The fact that the attorney's advice was unsound or erroneous will not affect the result." Id. 49 Conn. App. 596. The defendant has the burden of proof. DeLaurentis v. New Haven, supra, 220 Conn. 269. It CT Page 3330 should be noted under an advice of counsel special defense, the defense is not absolute and must require the defendant to make a full and fair statement of all facts, within his knowledge or which he was charged with knowing, to his counsel. Vandersluis v.Weil, supra, 176 Conn. 361; Mulligan v. Rioux, supra,229 Conn. 748-49. The counsel's advice must be explicit advice to commence litigation. Morgillo v. Loeb, Superior Court, judicial district of New Haven at New Haven, Docket No. CV 95-0371591S (December 4, 1996, Corradino, J.) 1996 Ct. Sup. 7363, 7366-67.
In-house counsel can be used for an advise of counsel defense. "Just because an attorney is in-house counsel does not mean that his opinions are necessarily suspect." Western Electric Company,Inc. v. Stewart-Warner Corporation, 631 F.2d 333, 337 (4th Cir. 1980); Spear v. Summit Medical Center, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. CV 92-0525939 (June 17, 1996, Sheldon, J).
Judge Sheldon, in Spear v. Summit Medical Center, set out five considerations for use of the advise of counsel defense in a vexatious litigation suit for both in-house and outside counsel. 1) The defendant must actually have consulted with legal counsel about his decision to institute a civil action, (2) The consultation with legal counsel must be based on a full and fair disclosure by the defendant of all the facts he knew or was charged with knowing concerning the basis for his contemplated complaint, (3) The lawyer to whom the defendant turns for advice must be one from whom the defendant can reasonably expect to receive an accurate impartial opinion as to the validity of his claim, (4) The defendant actually did rely on the advice of counsel in commencing the litigation, and (5) the defendant's reliance on counsel's advice was made in good faith. Spear v.Summit Medical Center, supra.
FACTS
This court finds the following facts to have been proven after considering the evidence and the credibility of the witnesses. Chase demanded the sum of $8,275,000 from Deltrade International, Ltd. and from Deltacorp Inc. on its guaranty on June 21, 1989. Chase sued both corporations who then went into bankruptcy. Chase sued the principal stockholder of both corporations, Antonino Castellett, who then went into bankruptcy. The underlying fraud suit was filed by Chase against Shea personally, returnable to the Superior Court, J.D. of Stamford/Norwalk on August 24, 1989. CT Page 3331 Chase withdrew that fraud lawsuit in May 1994. This August 1989Chase v. Shea fraud lawsuit is the underlying lawsuit in this vexatious litigation suit.
At all times mentioned herein Shea was the President and a Director of Deltrade International, Ltd. which was engaged in the business in trading sulphur and fertilizers on the international market. She owned no stock in the corporation or in any of the related corporations. The stock was owned 94.5% by Antonino Castellett and 5.5% by his wife. Shea was neither a borrower nor a guarantor of any Chase loans. She had been in the international commodity sales business since 1969 and in sulphur and fertilization international trading since 1974. Shea at this time also had corporate financial dealings with the following banks: American Express Bank, Citytrust, Fidelity International Bank, Brussels Lambert, Banco di Napoli, Union Trust, Gateway Bank and Hong Kong and Shanghai Bank. These banks all financed sulphur trades. Shea ran the day to day operation of Deltrade International, Ltd.
Shea signed an SEC filing, Exhibit 14, which stated as follows: "Stephanie W. Shea is Executive Vice President and Secretary of Deltacorp, Inc., Norwalk, Connecticut, a holding company in which Dr. Castellett is the president and sole stockholder. She is also President of Deltrade International, Limited, a subsidiary of the corporation engaged in raw material trading, a director of the bank, and Vice President and Secretary of Delta Realty." The bank referred to in this SEC filing is Colonial Savings Bank, SLA until January 15, 1988 known as Colonial Savings and Loan Association. The bank was located in New Jersey. Shea was also a Director of Codelco Inc. and as such she signed the SEC filings.
On behalf of Deltrade International, Ltd., Shea requested a $7,500,000 secured line of credit from Chase. She dealt with Chase's Vice President, Peter W. Galbraith. Chase prepared a September 30, 1988 commitment letter which outlined the terms of the loan and the documents required. Exhibit 24. The commitment letter stated that the loans were to be used to purchase sulphur, to "finance presold transactions" with a "$7,500,000 secured line of credit." A General Security Agreement was to be signed. "All inventory and receivables financed by Bank were to be specifically assigned to the Bank." Chase indicated that the loans were going to be advanced on the basis of "bankers acceptances, letters of indemnity and documentary letters of credit to finance presold transactions." Exhibit 24. At all times CT Page 3332 Chase was lending money on a secured basis. Exhibit 16. According to the assignment letters, Chase would have had four levels of security: (1) in the inventory, the goods themselves; (2) in the contract rights, (3) in the accounts receivable; and (4) in the subsequent proceeds in the event they were paid by the seller. Exhibit 83, third page. On June 2, 1998, Shea wrote to Chase informing them that the transactions were to be "self-liquidating." Exhibit 204. A General Security Agreement was executed by Deltrade International, Ltd by Stephanie W. Shea, its president, on October 7, 1988. Exhibit 26. On October 7, 1988, Shea on behalf of Deltrade International, Ltd. signed a Continuing Acceptance Agreement with Chase. Exhibit 27. Paragraph 4 of that Continuing Acceptance Agreement provided as follows: "The undersigned represents and warrants that . . . b) each such draft will finance a current shipment of goods . . . and f) no other financing is or will be outstanding in respect of such transaction during the period from the date of such draft until the maturity thereof." Exhibit 27. At the time the documents were executed Chase believed that Deltrade International, Ltd. was a Delaware corporation, was the trading arm of the business actually engaged in trading and had both assets and the sulphur.
In fact there was a second corporation also known as Deltrade International, Ltd. Although this second corporation has the same name, it was a Bermuda corporation. Deltrade International, Ltd, the Delaware corporation, formed in 1988 was a shell corporation, had no assets, was never involved in trading of sulphur and had no income. Deltrade International, Ltd., the Bermuda corporation, was formed in 1996 and was the trading entity. Shea testified that she signed the General Security Agreement, Exhibit 26, as President of Deltrade International, Ltd., the Bermuda corporation. She also signed the Continuing Acceptance Agreement as President of the Bermuda corporation. Exhibit 27. A corporate resolution was part of Exhibit 27 and the Continuing Acceptance Agreement contained a corporate resolution form on the second page entitled, "Certified Resolution for US Corporations." Shea signed this corporate resolution as the Secretary of "Deltrade International, Ltd., a US corporation." These last words were typed in the resolution. Exhibit 27 states over her signature that Shea certifies "that the following is a true copy of the resolution duly adopted at a meeting of the board of directors of said corporation held on October 7, 1998 and that such resolution is now in full force and effect." In actual fact it was the Bermuda corporation that had all the assets and the sulphur. It CT Page 3333 was the Bermuda corporation that was doing the trading of sulphur. This information was not made known to Chase. Chase would not have made any of the loans had it known that fact. The court finds that it is incredible that Shea would have signed both Exhibits 26 and 27 on behalf of the Bermuda corporation and yet signed the corporate resolution as part of Exhibit 27 as a US corporation. She is a sophisticated businesswoman trained in the trading of international goods for more than 20 years. Shea tried to explain this discrepancy by stating that she recalls signing a separate corporate resolution for the Continuing Acceptance Agreement as an officer of the Bermuda corporation. She has not been able to find a copy of it. No one produced a copy at trial. Chase could not find such a Bermuda officer's resolution in their files. Shea's testimony that she signed a proper Bermuda corporate resolution is not credible. Peter Galbraith testified credibly that he never saw a separate Bermuda corporate resolution. The court finds Mr. Galbraith credible.
Chase requested a Guaranty to be signed by Deltacorp Inc. for the performance of Deltrade International, Ltd. Exhibit 32. Chase typed out the corporate name of Deltrade International Ltd. on the guaranty form which stated that this corporation was "organized under the laws Delaware." Exhibit 32 contained the signatures of Shea. In this capacity she was signing on behalf of Deltacorp Inc. as its Executive Vice President. Deltacorp Inc. was the holding company for the two Deltrade International, Ltd., corporations and other entities. The fourth page of Exhibit 32, the Guaranty by Deltacorp Inc., contained the signature of Shea as Secretary of Deltacorp, Inc. This document states "WHEREAS Deltrade International, Ltd. (hereinafter referred to as the Borrower), a corporation organized and existing under the laws of Delaware." It is dated October 26, 1998. Shea admitted that this was her signature. She claimed that she signed this Guaranty on behalf of the Bermuda corporation. In two sections of Exhibit 32, both signed by Shea, it is clearly indicated in typed additions that Deltrade International, Ltd is a Delaware corporation.
Exhibit 226 is an Indemnity Agreement signed by Shea. She testified that she signed these documents as both as President and Secretary of Deltrade International, Ltd., the Bermuda corporation. Page 1 contains Shea's signature as President. The Corporate Board Resolution states: "I the undersigned duly elected, qualified and acting Secretary of Deltrade International, Ltd., a corporation organized and existing under the laws of the State of Delaware." Page 2 of Exhibit 226, shows CT Page 3334 that Shea signed this page twice. When confronted with the fact that her signature appears on behalf of a Delaware corporation she responded "I don't remember which corporation I signed this document for." The Chase signature card for this transaction for Deltrade International, Ltd contained no tax ID number and was signed by Shea on October 7, 1988. Exhibit 322. Attached to the signature card is a "Corporate Resolution" signed by Shea as Secretary of Deltrade International, Ltd., "a corporation duly organized and existing under the laws of the State of Delaware." Yet Shea testified those documents were signed for the Bermuda corporation. This court finds these claims and signatures inconsistent. The court cannot rely on Shea as a credible witness.
She personally represented to Galbraith and others from Chase at least twice that there was a pending merger of the Bermuda corporation with the Delaware corporation and that the Delaware corporation would be the trading entity. Galbraith testified that at his first meeting with Shea, she said that Deltrade International, Ltd. had gone through a reorganization, which allowed it to take advantage of certain changes in tax laws. The company was incorporated in Delaware to take advantage of some of these changing tax laws to minimize the tax liability of the overall group. Exhibit 17. Chase had a reason to not loan money until the merger had occurred. Chase was loaning against assets and never would have made the loan on an unsecured basis to a corporation which neither owned the assets nor did the trading. The court finds Chase had a legitimate business reason not to loan without the completion of the merger.
The merger never did occur. Chase was under the mistaken impression that the merger had occurred. "Though previously a Bermudian company, Deltrade reorganized after the changing tax laws and incorporated in Delaware." Exhibits 17. The Senior Officer Approval Memo, Exhibit 21, was prepared by Peter Galbraith indicating that the Delaware corporation was the trading entity. This only could have occurred if the merger took place. Exhibit 32, the guaranty by Deltacorp Inc., guaranteed the performance of the Delaware corporation which had no assets and was not engaged in any sulphur transactions. The guaranty does not mention Bermuda. The guaranty did not cover the performance of the Bermuda corporation, which in fact was the trading entity and owned the assets. The guaranty guaranteed nothing. Chase had no security by reason of this guaranty. Shea left Chase with the impression that the merger was about to occur. She never advised CT Page 3335 Chase that it had not occurred and that only the Bermuda corporation was involved in the trading. In her deposition Shea denied discussing the merger at her meeting with Chase on August 4, 1988 and she changed her testimony at trial. She testified that she told Chase the merger had not occurred on September 7, 1988. Chase representatives deny Shea made any such statements. This court does not credit Shea's statements and believes Peter Galbraith. The internal memos of Chase confirm and are consistent with the conclusion that Chase would not loan unless there was both security and a merger. Exhibits 8, 9, 15, 16, 17 and 21.
Codelco Inc., an affiliate corporation, made an inaccurate SEC filing in its form 10-Q dated August 31, 1988. Codelco purported to be a holding company owning the stock of Deltrade International, Ltd. Exhibit 213 at page S-00431 said: "The gross profits from the sale of sulphur, fertilizer and related product from the newly formed subsidiary Deltrade International, Ltd. were $1,346,000." Shea, when confronted on cross-examination, said someone made a mistake since the Delaware corporation never had any income. An earlier SEC filing, on July 14, 1988 at pages S-01424 correctly stated that the Delaware corporation had "no operating history." Exhibit 14. Shea signed the SEC filings. Codelco amended its June 30, 1985 10-Q filing on November 28, 1988 and its December 31, 1988 10-Q filing on March 10, 1989 stating that "Deltrade and Realty have not been active"; Exhibit 33 page S-00546, and "Deltrade and Colonial Realty are inactive," Exhibit 34 page S-00866. This may have been a cover up and not an attempt to correct an inadvertent error. The last combined financial statement prepared by outside CPA's prior to the Chase transaction stated that Deltrade International, Ltd. (Delaware) was non-operational for the prior year and Deltrade International, Ltd. (Bermuda) was operational. Exhibit 5 dated July 22, 1988. Although a prospective California real estate transaction was disclosed in Note 22, subsequent Events, the merger/reorganization of Deltrade International, Ltd. was not reported. In any event prior to June 1989 Chase did not know the merger had not occurred.
Shea offered Exhibits 83, 105, 106, 107, 108, 109, 110 111 in her case in chief in support of her claim that Chase had no probable cause of fraud on her behalf. She claimed that these documents accurately reflected the true state of the transactions and their financing. Further in support of her claim that Chase had no probable cause to sue her in fraud: She stated: no other bank sued her personally; the other banks were all creditors of CT Page 3336 Deltacorp and/or Deltrade International, Ltd. and none of them claimed fraud against Shea; all the transaction in which Chase lost $8,275,000 were real, not phantom transactions; all Chase's money went to pay for sulphur on Deltrade's account; the sulphur actually existed; all sulphur was shipped to Deltrade customers; no loan proceeds were paid by Chase directly to Deltrade; Deltrade received all the proceeds of the sulphur sales that were paid by Chase; Chase had security in each of the transactions and all the sulphur purchased by Chase's money was "pre-sold."
A series of documents were utilized to put into full force and in effect the actual loans. These transactions occurred from October 26, 1998 through March 9, 1999. All were exhibits in evidence Exhibits 83, 105, 106, 107, 108, 109, 110, and 111. A typical package of documents contained (1) an instruction letter to Chase manuscripted by Deltrade International, Ltd. and signed by Shea, found as the first page of each marked exhibit, (2) an invoice from the seller, (3) a certification letter to Chase presigned by Shea found on the third page of each marked exhibit, (4) an assignment letter presigned by Shea, found on the fourth page, and (5) presigned Bankers Acceptance Drafts. All documents were signed by Shea and another officer, usually James R. Barnett, Vice President. This court examined these in detail. Virtually every witness discussed these exhibits in detail. Over 160 multiple page exhibits were offered at trial many contained multiple sub exhibits. References to numerous other documents were contained in witness testimony. The court finds that Chase was paid back on only one of the loans. Exhibit 83. The other loans of over eight million ($8,000,000) dollars were not repaid by any of the corporations in question or any other individual or entity. Chase lost in excess of eight million ($8,000,000) dollars. The two June 12, 1989 demands for payment by Chase stated $8,275.000 was due. Exhibits 37 and 38. Chase had virtually no security on any of these transactions despite the documents signed by Shea.
All the transactions contained a presigned document entitled "Assignment Letter" on the letterhead of Deltrade International, Ltd. Each Assignment Letter was signed by Shea and an officer, James R. Barnett. The Assignment Letter discloses that Chase would have four levels of security in each of the sulphur transactions; "all the inventory, contract rights, accounts receivable and subsequent proceeds arising from the purchase of sulphur." of the seven loans that were not paid. back, Chase had no security in the inventory, no security in the contract rights, CT Page 3337 no security in the accounts receivable, and limited, if no security, whatsoever, in the subsequent proceeds. The monies had long since been paid to Deltrade International, Ltd. prior to Chase advancing the loans to Deltrade International, Ltd. All seven of these transactions either were not presold, were transactions that had already taken place for which Deltrade had already been received payment by the seller, or were non existent transactions.
In the normal transaction Shea would send a manuscripted letter to Chase. Each instruction letter was signed by Shea and Barnett and stated "We confirm that it has not been financed otherwise." Exhibits 83, 105, 106, 107, 108, 109 and 110. In Exhibit 111, the instruction letter stated, "We confirm that it will not be financed otherwise." Chase would then fill out the certification letter, assignment letter and Bankers Acceptance Drafts, all these documents having been presigned by Shea and Barnett. Chase would pay the supplier directly in a few days in accordance with the deposit information in the instruction letter. Chase then expected to get paid by Deltrade in 180 days as per the Bankers Acceptance Drafts that contained built in interest for these 180 days on the amount Chase sent to the suppliers. Deltrade would get paid by the customer and use this money to pay Chase or prepay Chase, if paid earlier. Chase financed each specific transaction. It was secured "gap" financing and not general open end financing without security.
Exhibit 263, a letter from C. Itoh, Co. (America) Inc. a sulphur purchaser, established these facts. Each of these exhibits 83, 105, 106, 107, 108, 109, 110 and 111, when compared to the transactions of Exhibits 263 indicate that many of these transactions had already been paid for by C. Itoh and the shipment had taken place well before Chase ever loaned the money. This was confirmed by the testimony of Linda Brownstein of C. Itoh. Chase would never have loaned the money without having a security interest in either the inventory, the contract rights, the shipment proceeds and the cash proceeds of payment. Since the money has already been paid in to Deltrade International, Ltd. and was in their fungible bank accounts, there was no security for Chase after the sulphur sale proceeds were deposited into Deltrade International, Ltd's. bank account.
An independent investigation of all of these transactions was conducted by Mary Brienza, an Assistant District Attorney of New York County. She was Senior Investigative Counsel in the Frauds CT Page 3338 Bureau. She investigated this matter from 1989 until 1992. She met with most Delta employees. She examined exhibits 83, 105, 106, 107, 108, 109, 110 and 111. She spent 4 days in Bermuda interviewing and examining records. She contacted the sulphur suppliers and obtained the documents from these suppliers. She subpoenaed other banks who financed sulphur trades of Deltrade International, Ltd. and who dealt with Shea. She obtained records from these banks. She spoke to their account officers. She checks real estate records and other transactions documents including Colonial Savings and Loan Association owned by Antonino Castellett. She reviewed thousands of documents. A number of exhibits were offered at trial to demonstrate that the New York District Attorney's office conducted an investigation of the entire matter independent of any investigation done by Chase. After examination of these exhibits and comparing them to the above mentioned Deltrade International, Ltd. exhibits, this court concludes that Chase did not direct, or control the New York District Attorney's investigation. Mary Brienza was at all times an independent investigator and not an alter ego of Chase doing the bidding of Chase.
In addition, these exhibits were offered a full exhibits by Chase as part of the cross-examination of Shea without any limitations. Shea objected to these series of exhibits of altered invoices on her cross-examination on the basis that they were made known to Chase well after the PJR vacating decision of May 1990 and after its May 1994 withdrawal of the underlying lawsuit. This court overruled the objection on the basis that General Statutes § 52-568 states "commences and prosecutes" an action and that it is relevant to Chase's special defense that Shea committed an actual fraud. "There is a distinction between the institution of an action and its continuance, and that, since the continuance of want of probable cause, or of bad faith and malice, might be shown by the plaintiff to increase damages, information acquired pending the prosecution, creating probable cause of inducing honest belief and consequent good faith, ought to be admitted to disprove malice and reduce damages." Smith v.King, 62 Conn. 515, 519 (1893).
Exhibit 83 is a C. Itoh transaction. The "certification" letter dated October 26, 1988 is in the amount of $1,438,414.78 with a date of shipment of 15,338 metric tons to C. Itoh on October 25, 1988. There was no invoice attached to Exhibit 83. These exhibits all came from Shea. Mary Brienza obtained invoice 14345 directly from Deltrade International, Ltd. records dated October 25, 1988 CT Page 3339 billed to Deltrade International, Ltd. Exhibit 314A. Mary Brienza obtained from Shell Canada Limited their copy of invoice 14345. Exhibit 314 C. It is for the same 15,338 metric tons of sulphur and is also billed to Deltrade International, Ltd. This invoice also totals $1,438,414.78. It is dated April 28, 1988. The terms of payment in Exhibit 314C by Deltrade International, Ltd. is "180 days due October 25, 1998." Deltrade International, Ltd. acting by Shea used the same invoice to obtain new financing from Chase. The invoice was altered by (1) changing the date from April 28, 1988 to October 25, 1988(2) eliminating the phrase, 180 days, (3) eliminating the interest charge, and (4) altering the price to include interest as a component of the sulphur price. At the time of the Chase financing in October 1988 the sulphur had already been shipped, the contract had been completed, the buyer C. Itoh had paid for the sulphur in full and the proceeds had been deposited to Deltrade International, Ltd. months before. Therefore, in effect, Chase loaned over $1,400,000 to Deltrade International, Ltd. on this transaction with no possibility of receiving any security. Shea knew these facts and did not so advise Chase. Chase was repaid this loan on Exhibit 83 by Deltrade International, Ltd., the only such loan transaction paid back.
On all seven unpaid transactions Chase paid the suppliers directly. Chase did not pay Deltrade International, Ltd. directly. Deltrade International, Ltd. received all the sulphur set forth in the documentation and sold all that sulphur and each transaction was shipped to the buyer. All purchasers received all the sulphur. All purchasers paid for the sulphur in full to Deltrade International, Ltd. The sulphur was not sold below cost. Chase was not repaid $8,275,000. Shea has testified that she has no knowledge where the $8,275,000 went.
The original invoice, Exhibit 314C, was not paid by Deltrade International, Ltd when due. Interest of $47,997.95 was due as shown by the Exhibit 314C. Added to the sulphur price of $1,309,416.83, this brought the total in the invoice to $1,438,414.78. Invoice 14348 in exhibit 314A states that the $1,438,414.78 is for sulphur only with no interest component when that invoice 14345 appeared in the Chase loan package. Not only had the date been altered but the interest due was deleted. Both invoices deal with the exact amount of sulphur, 15,338 metric tons, from the same ship. This court concludes that Exhibit 314C reflects what actually transpired and Exhibit 314A was altered by Deltrade International, Ltd. to CT Page 3340 obtain money from Chase. Chase was instructed to pay its loaned amount to Shell Canada Limited thus paying off invoice Exhibit 314C. This transaction was not in conformity with the loan documents. James Barnett first offered evidence in this case by video deposition on June 15, 1999. Exhibits, 346 and 350. James Barnett said he altered these documents at the request of Shea. Barnett made false statements to various banks including Chase at Shea's instructions. He said Deltrade was in arrears in paying off old bank loans when Deltrade starting obtaining loans from Chase despite the fact that he was convicted of a felony in regards to his Deltrade International, Ltd. activities. This court finds Barnett's testimony credible.
There is further information to be obtained from those documents. Exhibit 314B, dated April 28, 1988, relates to this same transaction of 15,338 metric tons. It is a commercial invoice issued by Deltrade International, Ltd. to Unifert International Ltd for the 15,338 metric tons, with instructions to have the "invoiced amount wired in same day funds immediately to the Hong Kong and Shanghai Banking Corporation." These documents show that Deltrade International, Ltd had already obtained financing on this same sulphur from Hong Kong and Shanghai Banking Corporation. When Chase financed this same transaction, 6 months after it actually occurred, Deltrade International, Ltd. was double financing the same transaction. There is no evidence that either bank knew what the other was doing. Shea never disclosed the double financing to either bank.
This pattern of obtaining loans from Chase on transactions that had long since occurred using altered invoices and double financing without disclosing that fact to either lender, appears in some of the other seven loan transactions in excess of $8,250,000 which were not paid back to Chase.
The next transaction was December 8, 1988 for 6403.97 metric tons. Exhibit 105. Invoice 14372 dated November 28, 1988 for $599,569.50 is part of Exhibit 105. Chase financed this transaction and was never repaid. Shea and Barrett signed the instruction letter in Exhibit 105 dated December 8, 1988 which stated, "The sulfur will be shipped under and C. Itoh contract." Mary Brienza obtained documents from Fidelity International Bank. Exhibit 316A. These exhibits disclose that Shea and Barnett signed the identical instruction letter dated 10 days earlier, November 29, 1988, for the same invoice 14372 dated November 28, 1988 in the amount of 6403.97 metric tons in the total price of CT Page 3341 $599,569.50. The instruction letter was addressed to Fidelity International Bank. The fidelity International Bank documents referred to the buyer Elf Acquitaine and the Chase papers referred tot he buyer as C. Itoh. It is impossible to have two buyers for the same goods. She did not explain this inconsistency. This creates an inference of double financing of the same transaction by both Chase and Fidelity International Bank. Shea's signature appears on both documents and she gave no explanation thereof. Barnett's signature appears on both documents and he testified that Shea requested him to alter documents.
Mary Brienza obtained a copy of invoice 14372 from Shell Canada Limited for the 6403.97 metric tons, Exhibit 316B. This invoice is dated over 6 months earlier, May 1, 1988, and is in the total amount of $599,569.50, the same amount on the invoice in Exhibit 105. Exhibit 316B dated May 1, 1988 has an additional sum of $23,212.20 for 210 days of interest included in the $599,569.50 total. This court concludes that only one shipment of 6,403.97 metric tons occurred. It was on May 1, 1988 for $576,357.30. Exhibit 316B. Deltrade International, Ltd. did not pay this original amount and with 210 days of interest the total due Shell Canada Limited by Deltrade International, Ltd. on November 27, 1988 was $599,569.50. Shea and Barnett altered invoice 14372, changed the invoice date to November 28, 1988 and created a Shell Canada Limited to Deltrade International, Ltd. invoice for the 6403.97 metric tons in the amount of $599,569.50. They submitted that altered invoice along with other documents to Chase in Exhibit 105 to obtain a loan from Chase of $599,569.50. Chase paid the sum directly to Shell Canada Limited as per the instruction letter thereby unwittingly paying off an old Deltrade International, Ltd. debt. Chase loaned the $569,569.50 to Deltrade International, Ltd. for a transaction that had occurred over 6 months prior obtaining no security for its loan.
By inference this court concludes that Deltrade International, Ltd. instructed Chase to pay that sum of $599,569.50 to Shell Canada Limited paying off the interest and principal due on the original May 1, 1998 invoice. Chase was never told this information. This transaction was not financing sulphur but was financing an old Deltrade International, Ltd. debt. Both Shea and Barrett signed a certification letter to Chase for this transaction stating "We certify that the proceeds of the above mentioned drafts will not be used for any other purpose." The purpose of the loan was "financing the following transactions." CT Page 3342 The instruction letter dated December 8, 1988 stated "As discussed, the sulphur will be shipped under our C. Itoh contract." In fact it had been shipped six months earlier. These representations under Shea and Barnett's signature were not true.
Shea and Barnett requested on December 21, 1988 that Chase loan Deltrade International, Ltd. $1,104,721 for the shipment of 11,858.50 metric tons. Exhibit 108. Shell Canada Limited invoice 14442 dated December 19, 1988 is part of Exhibit 108 and was testified to by Shea as being the accurate acutal documentation of the transaction. Mary Brienza obtained a copy of invoice 14442 from Shell Canada Limited for the same 11,858.50 metric tons. Exhibit 318A. This invoice though is dated June 20, 1988 and it was due on January 16, 1989. The June 1988 invoice contains 210 days of interest. The face amount of the sulphur purchased on Exhibit 318A is $1,067,265 whereas the Exhibit 108 invoice bills the sulphur at $1,104,721. The difference, $37,456, is the equivalent of 180 days interest on the $1,067,265. Invoice 14442 was altered. The same Shea and Barrett certification letter was sent to Chase. Thus Chase loaned funds not to finance a current transaction, but to finance a 7 month old debt of Deltrade International, Ltd., a transaction not within the contemplation of the parties nor the loan documents. Chase was not repaid. All Deltacorp and Deltrade entities went into bankruptcy.
Nine thousand and nine hundred and nineteen metric tons were involved in the December 9, 1988 transaction. Exhibit 106. The manuscripted instruction letter was signed by Shea and Barnett. Attached to the package of Exhibit 106 documents are the instruction letter dated December 9, 1988, invoice dated October 31, 1988 for $962,143, presigned certification letter, presigned assignment letter and three Bankers Acceptance Drafts. Shea offered this entire package on Exhibit 106 in her direct testimony. On cross-examination she was confronted with Exhibit 227, an October 13, 1988 letter signed by Shea to C. Itoh, which had typed in an adequate space above her signature, "Amount due 180 days from B/L date; US $1,011,043.67." Shea claimed that this addition was an unauthorized alteration. The last page of exhibit 338 contains the same October 13, 1988 letter as in Exhibit 227 only there is no signature on the signature line. The disputed wording appears in Exhibit 335. This court concludes that the disputed language was in Exhibits 227 and 335 when Shea signed exhibit 227.
It appears from an examination of these documents that the same CT Page 3343 9919 metric tons was financed by Chase in Exhibit 106 and American Express Bank in Exhibit 227. ("Please have payment made to American Express Bank") This conclusion is confirmed by the testimony of Sylvia Marie Challita, and American Express Bank officer. Exhibit 335. When comparing the Exhibit 106 documents with the C. Itoh letter in Exhibit 263, this court concludes that by the time Chase advanced there funds on December 9, 1988, the 9919 metric tons had been shipped to C. Itoh on October 31, 1988 and C. Itoh had paid Deltrade International, Inc. in full for the 9919 metric tons on November 8, 1988. Therefore according to the December 9, 1988 assignment letter Chase could not have had any security in the inventory, contract rights or the accounts receivable. A month before the December 9, 1988 Chase loan, these events had already occurred. The only possible security for Chase was the subsequent proceeds of the C. Itoh payment in the general accounts of Deltrade International, Ltd. When asked on cross examination if Chase had these proceeds as security or had these funds gone out Deltrade's door, Shea responded "I don't know."
This Exhibit 106 transaction has been previously financed by American Express Bank (AEB). The third page of Exhibit 335 from AEB contains a Deltrade International, Ltd. letter to AEB dated November 10, 1988 stating, "The loan to AEB to borrower is secured by the total Eligible Inventory and the total Eligible Receivable as stated herein." As of November 10, 1990 the total Eligible Inventory has already been shipped and the total Eligible Receivable had been paid to Deltrade International, Ltd. AEB had no security when AEB made this loan to Deltrade International, Ltd. Page 5 of Exhibit 335 shows that the total Eligible Receivable is the same $1,011,043.67 as contained in Exhibit 106. Deltrade International, Ltd. Used the same non-secured loan techniques on AEB as it did with Chase.
Exhibit 107 has two invoices which total $1,118,642. Chase advanced that sum on December 14, 1988. After comparing Exhibit 263 (C. Itoh 7/17/89 letter line 6 for $1,188,642 paid 5/3/89), Exhibit 348 (C. Itoh 9/11/89 letter line 6, for $1,011,043.67 and $177,598.33 totalling $1,188,642 paid 5/3/89) and Exhibit 375 (American Express Bank 6/29/89 letter paragraph 3.4) this court concludes that Deltrade International, Ltd. had received previous financing for the same transaction from American Express Bank. Again there was double financing not disclosed to Chase in violation of the certification letter under Shea's signature to the effect "We certify . . . that no other financing is being or has been obtained relevant to the transaction covered by the CT Page 3344 above drafts." Exhibit 107. This certification is not true.
Shea and Barnett requested on February 6, 1989 that Chase loan Deltrade International, Ltd. $987,576.08 for the shipment of 11,000.49 metric tons. Exhibit 109. Shell Canada Limited invoice 14467 dated February 3, 1989 is part of Exhibit 109 and was testified to by Shea as being the accurate actual documentation of the transaction. Mary Brienza obtained a copy of invoice 14467 from Shell Canada Limited for the same 11,000.49 metric tons, Exhibit 319B. This invoice though is dated July 9, 1988 and it was due on February 4, 1989. The invoice contains 210 days of interest on the face amount of the sulphur Exhibit 319B for $949,342.29 whereas the Exhibit 108 invoice is $987,576.08. The difference, $38,233.79, is the 210 days of interest actually billed Deltrade International, Ltd. in Exhibit 318B. Invoice 14467 was altered. These Chase loans did not finance a transaction. They financed a 7 month old debt of Deltrade International, Ltd. a transaction not within the contemplation of the parties nor the loan documents. Chase was not repaid.
Shea and Barnett requested in writing under the signatures on March 22, 1989 that Chase loan Deltrade International, Ltd. $1,121,864.63 for the shipment of 10,435.95 metric tons. Exhibit 110 contains Shell Canada Limited invoice 00497 dated March 22, 1989. Shea and Barnett sent to Chase a certification letter in support of the request, "That no other financing is being or has been obtained relevant to the transaction covered by the above drafts." Chase loaned the money. Chase was not repaid. C. Itoh was the purchaser. C. Itoh paid Deltrade International, Ltd. for the 10,435.95 metric tons on February 2, 1989 and March 10, 1989. Exhibit 263, lines 3 4 total 10,435.95 metric tons. The largest payment of $1,029,100 was made by C. Itoh on February 2, 1989, seven weeks before Chase loaned Deltrade International, Ltd. $1,121,864.63. C. Itoh made the second payment of $38,360.27 on March 10, 1989. An examination of Exhibit 320A discloses that Deltrade International, Ltd. had previously financed the transaction with American Express Bank, in violation of the terms of the Chase loan documents. Exhibit 320A indicates that Deltrade International, Ltd had not repaid the sum of $38,360.27 to American Express Bank despite the fact that over three months prior C. Itoh had paid Deltrade that amount. Shea signed the certification to that effect. The certification was not true.
Shea claimed that at all times Chase had security in these transactions, either in the inventory, the contract, the accounts CT Page 3345 receivables or in the general cash assets of Deltrade International, Ltd. From the court's review of these documents the conclusion is inescapable: at the time Chase loaned the money, the goods had been shipped, the contract has been fulfilled, the buyer had already made the payment and the buyer's payment had long since been paid into Deltrade International, Ltd.'s bank account. Thus, Chase had none of the four levels of security promised by Shea and the loan documents. Since the documents were signed by Deltrade International, Ltd, the Delaware corporation, and the guaranty ran to a Delaware corporation, there was no general corporate security. The Delaware corporation never had assets and never traded. The so called guaranty of Deltrade International, Ltd., the Bermuda corporation by Deltacorp Inc. was not effective since the corporate resolution was signed only by the Delaware corporation. Shea testified, "My understanding of the security interest was all of Deltrade and the guarantor's property and the proceeds of the contractual and the contract rights were the security interests." This court concludes that Shea's testimony in that regard is not consistent with the C. Itoh transaction time line in Exhibit 263 and the altered invoices.
In-house counsel, Lynne Barry, for Chase, analyzed each of these documents. In addition, Chase hired Robinson and Cole as outside counsel. Attorneys from Robinson and Cole analyzed each of these documents and physically obtained the information in Exhibit 263. The fraud lawsuit against Shea was commenced after both in-house counsel and outside counsel had sufficient information to believe that there was probable cause that Shea had committed a fraud by signing these various documents when she knew; there was no inventory, the proceeds had already been paid by the purchaser and received by Deltrade International, Ltd, and there was no security for any of these transactions. Counsel also knew that Shea had signed documents on behalf of a Delaware corporation that had no assets. They knew she had signed documents on behalf of a Bermuda corporation when the documents themselves indicate that it was a United States based corporation. Shea, according to the lawyers, was able to play the same name, Deltrade International, Ltd., between the Delaware corporation and the Bermuda corporation to the benefit of her trading companies and to the detriment of Chase.
Steven Humphrey advised Cathy Callahan of Chase they had a "strong foundation for the claim and that the claim should be made." Cathy Callahan also was told by Lynne Barry to sue Shea CT Page 3346 for fraud because of the documentary evidence and Shea's role in the various transactions. Prior to the commencement of the fraud lawsuit, Cathy Callahan had seen the July 1989 C. Itoh letter, Exhibit 263, and had independently reviewed the transaction documents to note the lack of matching dates, transactions and accounts. Cathy Callahan reached the conclusion based on the attorneys' advice and her examination of the documents, that Chase had no security interest in any of the unpaid seven transactions and that the actual transactions set forth in the Deltrade International, Ltd. documents were not what they purported to be. All counsel were of the opinion that none of the transaction documents indicated that Chase was willing to finance unsecured loans or transactions that had already occurred.
Lynne Barry interviewed and extensively reinterviewed Peter Galbraith and Cathy Callahan and read Chase's entire file. She drafted the demand letter and assisted in the drafting of the court documents including the PJR affidavit signed by Peter Galbraith. She researched Connecticut and New York law on various legal issues. She was familiar with the bankruptcy filings and the status of other litigation involving Shea, Chase and the Delta family of entities. She did factual research and met with attorneys from Robinson and Cole including Steven Humphrey. She was familiar with the C. Itoh letter, Exhibit 263, and had compared it with Chase's transaction documents. She reached a conclusion that Chase had a viable civil fraud claim against Shea. She recommended Chase file a civil fraud suit against Shea. Both in-house and outside counsel are bound by the same canons of professional responsibility. Goldenberg v. Corporate Air, Inc.,189 Conn. 504, 509 (1983); Rule 3.1 of Rules of Professional Conduct.
Steven Humphry reached the conclusion that Chase had a fraud claim against Shea. He recommended to Chase that they file a fraud suit against Shea. His associate, Kate Larson, also reached the same conclusion and recommended a fraud suit. He was the lead litigation counsel for Chase and as such was fully familiar with all that Callahan, Barry and Galbraith knew. He drafted the complaint and PJR application. He was instrumental in obtaining the C. Itoh information in Exhibit 263 and had compared the documents. He intervened C. Itoh representatives.
Both Lynne Barry and Steven Humphrey agreed in 1994 to withdraw the Chase lawsuit after a cost/benefit analysis due to the high costs of trial and too few assets available to collect on a Shea CT Page 3347 judgment. Exhibit 294, dated January 11, 1994 accurately reflects their opinion.
Lynne Barry also was of the opinion that the Deltacorp guaranty, Exhibit 32, did not guarantee anything. Deltacorp Inc. owned the shares of other corporations. It was a holding company. It did not own the underlying assets of Deltrade International, Ltd. of Bermuda. Therefore under this guaranty Chase would only have had a lien against the shares of stock of Deltrade International, Ltd. Thus Chase would have no higher priority than a stockholder. Any bankruptcy or lien on the specific assets would have higher priority than Chase. Therefore Chase, at best, would only share pro rata with any other unsecured creditor. In fact, the corporations went through bankruptcy and there were no assets for distribution. Chase received no money from the bankruptcy.
Considerable evidence was heard about a 134 count criminal indictment against Shea refused by the Grand Jury of the County of New York on March 20, 1991. A search of theDelta offices was suppressed. A sealing order may have gone into effect. Exhibit 143. The criminal case was not otherwise dismissed at that time. It was later withdrawn when the prosecutor in charge no longer worked for the District Attorney's office and another high profile fraud case took priority. Exhibit 146. Chase argues that such a criminal indictment is "prima facie evidence" of probable cause or a presumption of probable cause in a vexatious litigation case. This court does not have to reach that issue, having found sufficient evidence of probable cause without any New York indictment evidence. Mulligan v. Rioux, Supra,229 Conn. 749; Outlaw v. Meriden, 43 Conn. App. 387, 395 (1996).
A motion for summary judgment as to the statute of limitations special defenses was granted from the bench by the court prior to the commencement of trial. The defendants have reserved this issue for reconsideration. A separate memorandum of decision on the statute of limitation issues will be issued by this court. In light of this court's decision in favor of the defendant, their rights will have been protected.
The First count sounds in statutory vexatious litigation, General Statutes § 52-568, which states "commences and prosecutes." This changed the common law. Prior to this statute a party could only rely on facts known to that party at the time of the initiating of the underlying lawsuit. Thompson v. BeaconCT Page 3348Valley Rubber Co., 85 Conn. 493, 499 (1888) "The want of probable cause must be shown by facts and circumstances existing, and information which came to the defendant, at the time the prosecution was instituted." Id. 499.
In the underlying fraud suit an ex parte PJR was issued on August 31, 1989 and attached Shea's interest in real property in Darien, Connecticut. Shea filed a motion to discharge the PJR. After 13 days of testimony and 53 exhibits, a superior court judge granted the motion on May 18, 1990. This decision, Exhibit 54, has been cited by the plaintiff as a determination of no probable cause binding on this court. This court is not bound by the PJR decision of May 18, 1990 for the following reasons: (1) The evidence before the PJR court was not presented to this court at trial, (2) The James Barnett testimony was not before the PIR court, (3) The Mary Brienza testimony was not before the PJR court, (4) Substantially more documents were produced at trial, and (5) The altered invoices were not offered before the PJR court. Chase filed an appeal from the order vacating the PJR. The appeal was denied in a per curium decision. Chase Manhattan Bank,N.A. v. Stephanie W. Shea, 24 Conn. App. 169 (1991), cert. denied, 218 Conn. 908 (1991). Exhibit 64 and 65. See also Walshv. Stonington Water Pollution Control Authority, 250 Conn. 443,460-62 (1999).
On July 27, 1989 C. Itoh sent a letter to Attorney Steven Humphrey, Chase's counsel. Exhibit 263. This letter was offered as a full Exhibit. Shea did not question the accuracy of the transaction information contained in Exhibit 263. It outlined six C. Itoh transactions. The information in Exhibit 263 does not match the documentation offered by Shea in her direct testimony in exhibit 83, 105, 106, 107, 108, 109, 110, and 111 in the following manner: (1) the total metric tons in Exhibit 263 is 51,438.97 and according to Deltrade International, Ltd. records it was 63, 444.29 metric tons (Exhibits 83, 105, 106, 109, 110, 
111); (2) there is no explanation in any court exhibit or testimony for this substantial discrepancy; (3) the metric tons for each transaction do not match; (4) Some Metric tons do not match transaction dates; (5) the payments do not match; (6) the Deltrade International, Ltd. documents are internally inconsistent when compared with the Exhibit 263 information; (7) the shipping dates do not match; and (8) the invoices in the Deltrade International, Ltd. exhibits do not match the other information in Exhibit 263. When confronted with certain of these discrepancies on cross-examination, Shea testified "I don't CT Page 3349 recall. Nothing would surprise me". To other questions, there were long delays followed by, "I don't know, I have never read this document before." When asked if an altered invoice was sent to Chase, Shea responded "I don't know, I never instructed James Barnett to alter invoices shipped to Chase." In fact James Barnett testified that he was instructed by Shea to alter invoices. This court finds Barnett credible in this regard.
When asked as of June 24, 1999 did Deltrade International, Ltd. owe any money to banks that financed transactions other than the $8,275,000 owed to Chase, Shea responded "I don't know." At all times Shea was its President, director and the chief trading officer. It anyone should know, it would be Shea. She was familiar with the minute details of transaction financing. Exhibit 18.
CONCLUSION
This court finds that Shea is not a credible witness. This court finds the testimony of James Barnett, the internal officer of Deltrade International, Ltd., credible. Mr. Barnett was involved in these eight transactions on a day to day basis. He was arrested and pled guilty to criminal acts arising out of these transactions.
This court concludes that Chase, at the time that they instituted the underlying fraud suit, had probable cause against Shea to commence such litigation in the Connecticut Superior Court. They had probable cause to prosecute the fraud action. They had probable cause at the time Chase withdrew the action against Shea. Chase withdrew the underlying action for two reasons, (1) Shea was virtually judgment proof at that time, and (2) Chase would have to expend additional attorneys fees to obtain ajudgment that was probably not collectible. Either is a valid business reason for the withdrawal of the underlying lawsuit. The withdrawal of the lawsuit, under these circumstances, does not establish lack of probable cause by Chase. The plaintiff has failed in her burden of proof to establish probable cause. She has failed in her burden of proof to establish any degree of malice whatsoever. The issues on the First count, General Statutes § 52-568 must be found in favor of the defendant Chase.
The allegations of the Second Court, CUTPA all assume that there was a lack of probable cause for Chase to commence and/or CT Page 3350 prosecute the underlying lawsuit. This court having found that there was probable cause at all times for Chase to commence and prosecute this underlying lawsuit, the issues on the Second count must be found in favor of the defendant, Chase.
The issues on the advice of counsel special defense are found in favor in the defendant, Chase. The defendant has sustained its burden of proof in proving advice of counsel for both in-house counsel and outside counsel. Both counsel had full knowledge of all the facts of this case. All counsel specifically advised Chase that it file a civil fraud action against Shea. The attorney's had the full cooperation with all the knowledgeable employees of Chase. They had all of Chase's documentation. Counsel was able to obtain information unknown to Chase from other suppliers and other lending institutions. It was reasonable for Chase to rely on advice from both in-house and outside counsel in this matter. These records demonstrate that these seven transactions had actually been financed by other lending institutions or that the transactions were either non-existent or had already been delivered and paid for. This information was not known to Chase employees but was obtained by counsel. Chase in good faith relied on counsel's advice. All counsel knew all this information when it advised Chase to commence and continue to prosecute the fraud lawsuit. Counsel therefore, has met all of the five requirements of the advice of counsel defense. Spears v.Summit Medical Center, Supra. The issues on the Fourth special defense are found in favor of the defendant, Chase.
Because of the decision in this case the trial court will not consider alternative grounds, for finding the issues in favor of the defendant. Elm City Cheese Co. v. Federico, 251 Conn. 59, 67
n. 13 (1999).
For the reasons stated, judgment will enter in favor of the defendant, Chase, as to the First and Second count of the complaint. Ancona v. Manafort Brothers, Inc., 56 Conn. App. 701
(February 22, 2000).
Costs are awarded to the defendant, Chase.
BY THE COURT.
KEVIN TIERNEY, J. CT Page 3351